HARVEY BUTLER and IDA BUTLER, Respondents, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, April 3, 1911.

1. **RAILROADS: Death by Wrongful Act: Duty to Infant Invitees.** Plaintiff's infant son, a child five years old, was instantly killed by being run over by a grain car while playing on a house or team track at a point just west of where the grain car stood before it was. struck. At the time, plaintiff, the child's father, was unloading wheat into the grain car for shipment over the defendant's railroad. The child's death was caused by defendant's act in switching back on the house track, and colliding violently with the grain car. Before the injury occurred, the conductor of the train knew that the lives and safety of persons who were lawfully at work in and around the grain car would be endangered by thus switching. *Held*, that the father was not a trespasser nor bare licensee, but an invitee, and that the relation of the child to defendant was the same as that of his father. Hence, although there was no evidence that the trainmen had actual knowledge of the peril of the boy, the trial court did not err in holding defendant liable on the

Butler v. Railroad.

hypothesis that by the exercise of ordinary care defendant could have known of the presence of and danger to the boy in time to have saved him.

2. ————: **Duty to Trespasser or Licensees.** A railroad company may be held liable for injury to trespassers or mere licensees on railroad property only in cases where it has actual knowledge of the presence of the trespasser or licensee in time to avoid the injury by the exercise of reasonable care or where the use of the property by trespassers or licensees has been so customary that the company has reason to anticipate the continuance thereof.

3. ————: **Duty to Invitees.** The infant's father, who was loading grain in defendant's car for shipment over defendant's railroad, was on the premises as the invitee of defendant, and, since the rule in regard to invitees is that defendant owes them the duty of ordinary care to protect them against injury from defects in the place, or from instrumentalities he employs in his use of the premises, defendant had no right to disturb the grain car without giving ample warning to those at work in and about it.

4. ————: ————: **Wanton Invasion of.** The act of defendant in switching back on the house track so recklessly as to collide violently with the grain car after its conductor knew that the lives and safety of persons lawfully at work on the premises would be endangered by such act, and had given assurance that he would not allow the car to be struck, was more than mere negligence. It was a wanton invasion of the rights of others deserving of the severest reprobation.

5. ————: **Status of Invitee's Child: Duty to Anticipate Child's Presence.** Where a parent comes as an invitee, the child he is suffered to bring with him on the premises partakes of his own invitation, as it is not going too far to say that carriers should anticipate that parents who come to their stations to transact business with them, or in which they are concerned, are likely to be accompanied by children. Hence, the deceased infant was not a trespasser, or bare licensee, but was on the premises by implied invitation of defendant.

Appeal from Buchanan Circuit Court.—*Hon. L. J. Eastin,* Judge.

AFFIRMED.

*Brown & Dolman* for appellant.

*Charles C. Crow, Nevill & Grier* and *Vinton Pike* for respondents.

JOHNSON, J.—This action is prosecuted by the parents of Thomas Butler, deceased, a minor, to recover statutory damages for the death of their son which they allege, was caused by the negligence of defendant. Plaintiffs recovered a verdict and judgment for three thousand dollars and the cause is before us on the appeal of defendant.

The death of the child, who was five years old, occurred in the morning of September 3, 1908, in the yards of defendant at Maysville. The tracks of defendant run east and west and consist of a main and a passing track south of the station building and a house or team track north of the building. Board platforms intervene between the building and the main and house tracks and there is a platform at the east end of the building. A public road crosses the tracks just east of the station and a wagon road runs parallel to the team track on the north side thereof. A car being loaded with wheat for transportation over the railroad stood on the team track at a place opposite the west end of the building. There was clear space of one hundred feet or more west of this car which we shall call the grain car, and there was nothing to prevent the operators of trains coming from the west from seeing the grain car and the team track. Immediately west of the car there was a small pile of rock screenings on the team track. Plaintiff, Harvey Butler, a farmer, brought in a load of wheat he had sold to a shipper who was loading the grain car. His little boy, Thomas, accompanied him and when the wagon was backed up to the car door, the boy was permitted to alight and to engage in play with the little son of the station agent while the father proceeded with his work of shoveling the wheat into the car. A man inside the car distributed the wheat as it was shoveled in and a canvas apron placed from the end of the wagon into the car and attached to each vehicle caught the wheat that

155 App.—19

fell in shoveling and which, but for the screen, would have been wasted. The boy did not go far away from where his father was working but, with his playmate, spent most of his time at the pile of rock screenings. Another car, designated the Wabash car, stood on the team track, between the grain car and the public road east of the depot. The evidence of plaintiff asserts that a space of eight or ten feet separated the two cars, while that of defendant is that the cars were coupled together. East of the public road three cars stood on the team track, one of them a car loaded with merchandise. Shortly after Mr. Butler had begun unloading, a freight train came in from the west on the main line and stopped so that a number of freight cars and the caboose were west of the building.

Mr. Butler had unhitched the forward team from the wagon before he began unloading and when the freight train came in he unhitched the wheel horses and then returned to his work. He testified as follows relative to the attention he gave his child during his work of unloading:

"Q. The child that met with the accident came in with you on the load of wheat, did it? A. Yes, sir.

"Q. Did you pay any further attention to it, at all, after it got out of the wagon? A. Yes, sir, yes, sir, yes, *sir!*

"Q. Did you know that it was on this track? A. Yes, sir it was out in front of the horses part of the time, and part of the time they were on the track, where I could keep my eye on them.

"Q. Which way did you drive in from? A. I drove in from the east, towards the west.

"Q. And your horses were headed to the west? A. Yes, sir.

"Q. And you say that you knew that the child was on the track, at the west end of the car? A. Yes, sir, on the track, and supposed to be as safe as in your back yard.

"Q. Well, the cars were made for the purpose of being moved? You knew that, of course? A. Yes, sir.

"Q. And that the railroad track was made for the purpose of moving them on? You knew that? A. Yes.

"Q. And it never occurred to you that it was dangerous for a child to be on a railroad track, that was part of the actively operated part of a railroad? A. I didn't suppose the child was in danger, because, to my supposition, the train was on the other side of the depot, entirely.

"Q. And you never even looked to where the train went after it came to the depot? A. I heard it, but it was almost impossible for me to see it, because the depot was in the way, and those other cars."

The train had business to transact and the conductor came to the station, exchanged billing with the agent and was informed that the merchandise and Wabash cars were to go east in his train. He remained on the platform for sometime—long enough to play with another child of the agent—and at the proper time, he directed a brakeman to detach the engine and eight forward cars from the train and have them run forward and switched back on the house track to pick up the merchandise and Wabash cars. This order was carried out while the conductor remained at the station. When the shipper of the wheat, who was at the station, observed that the detached engine and cars were switching on to the house track, he went to the conductor and inquired about the purpose of the switching. We quote from his testimony:

"Well, when I saw them pulling ahead, I began to walk back towards the depot. I was at the west end of the depot, and there is two switches east of the depot; one drops off to the south, to go below the main line, and the other north on the north side, and I supposed, maybe, that they were going to drop in on the south of the main track, but when I saw them pulling up the

line far enough to pass the last switch, I knew then that they were coming in on the north side of the depot, on the track where these people were.

"Q. What did you do then? A. I rushed up to the conductor . . . and asked him how far he was coming in on that track.

"Q. What did he say? A. Why, he says: 'Just far enough to catch that Wabash car.'

"Q. Did you know where the Wabash car was then? A. No, sir.

"Q. Just go on and tell what else was said. A. I said: 'I thought if you were coming in far enough to strike my grain car, you had better go around and notify those people. They may get hurt.'

"Q. What did he say? A. I don't think he said a word.

"Q. Did he move? A. Well, I kept walking on, myself, and he got up and followed me, but not close to me—a few feet behind me.

"Q. Did he do anything? A. No, sir.

"Q. Did he try to signal the engineer? A. Not that I saw."

The train backed up rapidly and after bumping into the cars east of the public road, kept on coming at a rate of speed indicating that it would force the Wabash car into a violent collision with the grain car. We quote further from the shipper's testimony:

"Q. Just go on and tell what happened. A. Well, I kept walking on up towards the east end of the depot, and as soon as I saw for myself that it was not one of the cars that sat beyond the wagon crossing, why, I rushed across to notify these fellows, myself, but they was coming back there with such force, and after they had struck these cars, only a street between those cars and the empty, that it was shown later they were after, I hadn't time to do anything; I got across, myself, and hollered.

"Q. What did Butler do? A. I hollered at Butler.

I just hollered: 'Look out!' to everybody. I just hollered: 'Look out!' Now, Butler, I think heard me, but the crash came so close to my yell—

"Q. What did you say about the crash? A. It came so close after my yell, that he didn't have time—

"Q. Well, what was Butler doing, when you got across there? A. He was scooping wheat.

"Q. Where was his wagon? A. Right by the side of the door.

"Q. It was not forty feet away? A. No, sir.

"Q. Where was his team? A. One team was hooked to the wagon.

"Q. How fast was that car coming back? A. Well, I don't know. It was coming back with pretty good force, it looked to me like.

"Q. Did it hit his car? A. Yes, sir.

"Q. How far did it knock that car? A. About fifteen feet, I judge.

"Q. What did it do to the wagon? A. Well, I had a grain sheet there, a heavy canvas, with a gas pipe in each end of it; I used it to save the wasteage of the wheat. We throw one end of it into the grain floor, and the other end into the wagon, and at this time, when the car was shoved by, the end of the gas pipe struck against the end of the wagon, and knocked the spring seat down, tilting the iron up, and almost hitting Butler, but it didn't hit him.

"Q. Where was the conductor at that time? A. The conductor at that time, was on the platform, south of where the car was.

"Q. Why didn't *you* notify this man? A. I didn't have time. I did the best I could.

"Q. Well, at the time you told the conductor, would you have had time then to have notified them? A. Oh, yes, I would have had plenty of time.

"Q. Why didn't you notify them then? A. Because I thought, from the remark I got from the conductor that they were not coming in there that far."

The two children playing at the west end of the grain car were run over and both were killed instantly.

The facts stated, collected from the evidence introduced by plaintiffs, are contradicted in some particulars by the evidence of defendant, but in the view we take of the case, it is not necessary to refer to the contradicting evidence.   The court overruled the demurrer to the evidence offered by defendant and at the request of plaintiff, instructed the jury that if they "believe from the evidence, that the servants and agents of defendant in charge of the operation of its train in question, knew, or by the exercise of ordinary care, could have become aware that plaintiff's son was on defendant's track, in front of the car being loaded by plaintiff, Harvey Butler, and having such knowledge, caused its train to be run back and against the cars being loaded, as aforesaid, pushing the same over and killing plaintiffs' child, Thomas Butler, they will return a verdict for the plaintiffs.

"Whether the defendant's agents and servants aforesaid, had such knowledge of the position and situation of the plaintiffs' said son, is a fact the jury may find from all the facts and circumstances in evidence.   Provided, you believe from the evidence, the deceased was the infant son of the plaintiffs."

At the request of defendant the jury were instructed "that if they believe from the evidence, that the plaintiff, Harvey Butler, permitted his infant son to play on the track as stated in the evidence, when he, by the exercise of ordinary care, could have known, that defendant's cars were about to be backed on to said track, then plaintiffs cannot recover in this case."

Another instruction asked by defendant was modified by the court over the objection of defendant.   We copy the instruction as given, italicizing the interpolation:

"The court instructs the jury, that defendant owed plaintiffs' son no duty, except to use all means in its

power to avoid injuring him, after becoming aware of his peril, and unless you find and believe from the evidence, that defendant's agents and servants in charge of the train in question, became aware of the presence of the plaintiffs' son, *or by the exercise of ordinary care could have become aware of his presence* upon the track and in a place of danger, before the accident occurred in time to have avoided the same, then your verdict must be for defendant."

The cause of action asserted by plaintiffs is grounded in negligence and springs from the breach by defendant of some duty it owed the deceased child. Plaintiffs cannot recover unless it be found that the child would have had a meritorious cause of action against defendant had it survived the injury, since whatever rights plaintiffs may have are purely derivative. Counsel argue that defendant was guilty of no negligence towards the child; that he was a mere trespasser on the track and that defendant had no reason to anticipate his presence in such a dangerous place. It is contended that there is no evidence that the trainmen had actual knowledge of the peril of the boy and that the court erred in holding defendant liable on the hypothesis that by the exercise of ordinary care defendant could have known of the presence of and danger to the trespasser in time to have saved him.

In support of this argument, we are cited to the following cases: Williams v. Railway, 96 Mo. 275; Curley v. Railway, 98 Mo. 13; Barker v. Railroad, 98 Mo. 50; Rine v. Railway, 88 Mo. 392; Berry v. Railway, 124 Mo. 223; Barney v. Railroad, 126 Mo. 372; Rushenberg v. Railway, 109 Mo. 112; Witte v. Stifel, 126 Mo. 295; Levelsmeier v. Railway, 114 Mo. App. 412; Kelly v. Benas, 217 Mo. 1; McQuary v. L. & N. R. R. Co., 128 S. W. Rep. 329; Carrier v. Railway, 175 Mo. 470.

In all of these cases where the cause of action was denied, the injured person was a trespasser, or, at least, a mere licensee on the premises of the defendant. The

rule as to trespassers who intrude where they are not invited is that they take the premises as they find them and that the owner is "liable only for concealed spring guns or other hidden traps intentionally put out to injure them, or any form of willful, illegal force used towards them." [Kelly v. Bonas, supra.] As to mere trespassers on railroad property the company may be held liable for injury to them only in cases where it has actual knowledge of the presence of the trespasser in time to avoid the injury by the exercise of reasonable care or where the use of the property by trespassers has been so customary that the company has reason to anticipate the continuance thereof. Such use will impose the duty on the company's servants of exercising ordinary care to discover the peril of the endangered trespasser.

The rule is the same as to a mere licensee. [Barney v. Railroad, supra.] "Even as to a licensee, the rule is that 'no duty is imposed by law upon the owner or occupant to keep his premises in a suitable condition for those who come there solely for their own convenience or pleasure, and who are not either expressly invited to enter or induced to come upon them by the purposes for which the premises are appropriated and occupied, or by some preparation or adaptation of the place for use by customers or passengers, which might naturally and reasonably lead them to suppose that they might properly and safely enter.' [Straub v. Sodorer, 53 Mo. 43.]

"In short, mere passive acquiescence of the occupier in a certain use of his land by others, generates no liability on his part. [Moore v. Railroad, 84 Mo. 485.]"

The duty of the owner to persons who come on his premises by his invitation express or implied is different. He owes them the duty of ordinary care to protect them against injury from defects in the place or from instrumentalities he employs in his use of the premises.

The boy's father was on the premises as the invitee of defendant. He was there loading grain in defendant's car for shipment over defendant's railroad. The car had been placed on the house track which was the connecting link between the railroad and the farmer—the umbilical cord through which the railroad obtained its sustenance. Defendant had no right to disturb that car without giving ample warning to those at work in and about it.

In the operation of a railroad it frequently occurs that the disturbance of cars placed for unloading is necessary while the unloading is being performed but in all such cases it is the duty of the company to warn those occupied in the work of unloading of the contemplated movement in time for them to give heed to their safety. (Railway v. Goebel, 119 Ill. 515; Jacobson v. Railroad, 41 Minn. 206; Ryan v. Railroad, 115 Fed. 197; Railroad v. Shaw, 116 Fed. 621; Railway v. Duncan, 88 Texas 611; Railway v. Brown's Admr., 49 U. S. App. 101.) Plaintiff being in the car rightfully at the invitation of the consignees and engaged in the work connected with the process of unloading was entitled to warning of what was coming." [Lovell v. Railroad, 121 Mo. App. 471.]

The act of defendant in switching back on the house track so recklessly as to collide violently with the grain car after its conductor knew that the lives and safety of persons lawfully at work on the premises would be endangered by such act and had given assurances that he would not allow the car to be struck, was more than mere negligence. It was a wanton invasion of the rights of others deserving of the severest reprobation.

We think the relation of the child to defendant was the same as that of its father. It was not a trespasser or bare licensee but was on the premises of defendant by implied invitation. It was a mere baby and came not of its own independent volition but under the dominion and care of the father, its natural guardian and protec-

tor. It was a natural act of parentage for the father to take his boy with him and we are not going too far when we say that carriers should anticipate that parents who come to their stations to transact business with them, or in which they are concerned, are likely to be accompanied by children. [Shortridge v. Scarritt Estate Company, 130 S. W. Rep. 126.] If the parent comes as an invitee, the child he is suffered to bring with him on the premises partakes of his invitation. Any other rule would infringe upon the instinctive habits and rights of parent and child. Had defendant done its duty the child would have been in no danger and, as the stricken father remarked, would have been as safe as it would have been if playing at its own home. The tort of defendant's servants appears as the proximate cause of the tragedy. We find no occasion for holding the father guilty in law of contributory negligence.

The demurrer to the evidence was properly overruled and there is no prejudicial error in the instructions.

A question of evidence raised by defendant is ruled against its contention.

The judgment is affirmed. All concur.