WILLIAM TOMLINSON, by JENNIE TOMLINSON, Next Friend, Respondent, v. JOHN MARSHALL, et al., Appellants.

Kansas City Court of Appeals. December 5, 1921.

1. NEGLIGENCE: Master and Servant: Question of Contributory Negligence of an 18 Year Old Inexperienced Employee Injured by Rollers of Laundry Mangle was for the Jury. Where an 18 year old, inexperienced boy, employed in a steam laundry, was ordered by foreman to go through a narrow space to the rear of a laundry mangle, for the purpose of oiling a part of its machinery, and while returning in obedience to an order to come out, was required to pass one going into said narrow passageway and in attempting to do so, became overbalanced and involuntarily threw out his hand where it was caught by the rollers of the mangle and injured, held, that the question of his contributory negligence was for the jury.

2. LANDLORD AND TENANT: Unguarded Machinery: Landlord Leasing a Laundry With Machinery Unguarded in Violation of Statute Held Liable for Injury Resulting Therefrom to Employee

of Tenant. Even if defendants were merely landlords, nevertheless they were liable, in view of the provisions of section 6786 and especially of section 6806, Revised Statutes 1919, inasmuch as they were owners of the laundry *plant*, the "establishment" or *business* mentioned in said section 6806, and, in violation of the terms thereof, did "aid" and ''abet'' the violation of section 6786 by leasing the establishment and business to tenant with the machines thereof in an unguarded condition.

3. ———: ———: **Where after Lease of Factory or Business the Tenant in the Conduct Thereof Violates the Statute in Failing to Guard Machinery, the Tenant and not the Landlord is Liable Therefor.** Where the owner or landlord leases a building to the operator of a factory, establishment or business, who in the conduct of such business violates section 6786, Revised Statutes 1919, in failing to guard machinery, the operator of such factory and not the owner or landlord is rendered liable under the guarding statute.

4. **EVIDENCE: Contract: Lease: Master and Servant: Employee may Show by Oral Testimony that a Contract Between his Employer and Others was not ·a Lease but a Partnership Agreement.** Where a laundry establishment was operated under an instrument which recited that the same was leased by the tenant from month to month for a rental of a sum equal·to one-half the net profits earned in each month, an employee of the tenant injured by unguarded machinery, not being a party to such instrument, is not conclusively bound thereby in a suit against the owners for damages, and may show ·by oral testimony that the *status* between the owners and his employer, the tenant, as to the operation of the laundry was not that of landlord and tenant, or that the lease was subsequently so modified and changed by mutual or oral agreement that the operation of the laundry thereafter was not by his employer as a tenant, but that the operation thereof was participated in by the defendants as partners or as employers of the employer of plaintiff and himself.

5. **APPEAL AND ERROR: Verdict Based upon Substantial Evidence Will not be Disturbed on Appeal.** Where it is clear that the verdict in plaintiff's favor is based upon substantial evidence, the plaintiff will be allowed to prevail on appeal.

6. **LANDLORD AND TENANT: Master and Servant: Evidence held to Support Verdict on Finding of Jury on Issue of Relation Created by Operation of Laundry under Written Instrument.** In an action by an employee against the owners and operators of a laundry for injuries sustained by unguarded machinery, evidence *held* to support a verdict in plaintiff's favor based upon substantial evi-

dence, on the ground that, notwithstanding an instrument in writing reciting an agreement of lease between defendants and the employer of plaintiff, defendants in reality operated the laundry as their own, and that plaintiff's employer was not a tenant but an employee of the defendants.

Appeal from the Circuit Court of Chariton County.— *Hon. Fred Lamb,* Judge.

AFFIRMED.

*Harris L. Moore* for respondent.

*M. G. Roberts, Gilbert Lamb,* and *Farris & Sons,* for appellants.

TRIMBLE, P. J.—Plaintiff, an 18 year old boy, was an employee in a steam laundry. His duties were to oil the laundry machinery and to fire the engine. He was inexperienced in such work, having done nothing of the kind before except to fire the engine of a threshing machine for a short time.

About a week after he had been at work in the laundry, he was ordered by Fredericks, the man in charge of the laundry, to go to the rear of one of the machines, a laundry mangle, and oil a part of its machinery. This machine sat out a short distance from the wall, and plaintiff "went in behind and oiled the west end of the machine." While doing this, Fredericks' wife and daughter also came back behind the machine. As plaintiff was going out, Mrs. Frederick was going in and they met in the narrow space at a point about two feet from the east end of the machine. She backed up against the wall and he essayed to pass her, having his back to the machine. In attempting to get by her, he became overbalanced and, being about to fall, he involuntarily threw out his hand where it was caught by the rollers of the mangle and so badly mashed and burned that it had to be amputated. He brought this suit for damages, basing it upon negligence in the failure to guard the machine as required by section 6786, Revised Statutes 1919. The evidence tends

to show that it was necessary, at times, for employees to go behind the machine in the course of their work, and the narrow space between the machine and the wall had to be used by them for this purpose. The evidence also discloses that the machine was not provided with a guard to protect employees from injury when thus going to its rear; that other machines were thus guarded and that a guard could have been provided that would have been efficacious and would not have interfered with the operation of the machine.

A trial resulted in a verdict and judgment in plaintiff's favor for $2000, and defendants have appealed.

There is no contention that the situation was such that a guard was not required by the statute, nor is any complaint made against the instructions or the manner of trial. The contention is that the defendants are not liable and therefore their demurrer to the evidence should have been sustained. This rests upon two claims, namely: First, that about ten days before plaintiff's injury, defendants had leased the laundry to their former foreman, Fredericks, and consequently, at the time plaintiff was hurt, the latter, and not defendants, was operating the business or establishment. Second, that plaintiff was guilty of contributory negligence.

As to this last-mentioned defense, we think little need be said. The record not only discloses evidence supportting the circumstances surrounding the happening of the injury as hereinbefore detailed, but it also shows, according to Fredericks' own testimony, that at the time his wife was going in behind the mangle he told plaintiff to come out from behind it. So that, under the evidence, the jury could find plaintiff, in both going in and coming out, was obeying the orders of the man in charge. We would not be warranted in holding that this 18 year old, inexperienced boy, obeying orders, was guilty of contributory negligence as a matter of law, when his hand was thus involuntarily thrust out and into contact with the rollers as a result of his losing his balance as he passed the lady in the narrow space where they met. [Wilson v. United R.

Co., 169 Mo. App. 405; Sullivan v. Hannibal, etc., R. Co., 107 Mo. 66, 78; Butz v. March Bros. Const. Co., 199 Mo. 279; Dowling v. Allen, 102 Mo. 213; Schroeder v. Chicago, etc., R. Co., 108 Mo. 322.] The attempt to pass the lady in the space afforded was not fraught with such imminent and apparent danger that no reasonable man would have attempted it. Indeed, plaintiff would have gotten by safely had it not been for the unforeseen occurrence of his getting overbalanced, thereby causing him to involuntarily thrust out his hand to where it was caught by the rollers. Fredericks himself says that when plaintiff attempted to get by, it was by his expressed order, and that he had done the same thing himself. The question of contributory negligence, therefore, was clearly one for the jury.

The other defense, that the laundry had been leased by defendants to Fredericks and that consequently at the time of plaintiff's injury, they were not operating the laundry, is met by a two-fold contention on plaintiff's part: *First,* that, notwithstanding the written instrument between defendants and Fredericks denominated a lease, the defendants did not assume the relation of landlord nor did Fredericks occupy the position of a mere tenant, but that the defendants retained an interest in and a control over the business either as parteners or employers. *Second,* that even if Fredericks could be said to be a real tenant and the defendants merely landlords, nevertheless they were liable, in view of the provisions of section 6786 and especially of section 6806, Revised Statutes 1919, inasmuch as they were owners of the laundry *plant,* the "establishment" or *"business"* mentioned in said section 6806, and, in violation of the terms thereof, did "aid" and "abet" the violation of section 6786 by leasing that establishment and business to Fredericks with the machines thereof in an ungarded condition. In this connection it may be well to observe that the contention just stated does not mean that if owner of a *building* leases the same to the operator of a factory, establishment, or business (who in the con-

duct of such business violates section 6786 in failing to guard his machines), such owner or landlord, is rendered liable under the aforesaid statutes. In this case the defendants did *not* own the building; they merely owned the laundry *plant* or *outfit* and the laundry *business* as a going concern. In the conduct of such *business* they failed to have the machine guarded; and they leased the plant, establishment and business, a going concern then in operation, with the machines thereof in an ungarded condition. The question is whether, under these circumstances, they come within the meaning of section 6806 in that they, as *owners* of that going *business,* by leasing the same with the machines thereof unguarded, have not thereby assisted, or as the statute puts it, aided and abetted the tenant in violating section 6786 and thus rendered themselves liable in damages to one injured by such unguarded machine? The question is an interesting one, but, so far as we have been able to find, has never been directly and specifically passed on by the courts.

It is no doubt well settled that a landlord, in the absence of an agreement, is not liable for repairs, or for the consequences of a lack of repairs. But if he has machinery in the operation of a factory business, the condition of which machinery is such as to be a nuisance, or if its operation without guards is a violation of a statute, and he leases it in that condition, is he liable to a party injured whom the statute intended to protect, even though, as in this case, the injured person is an employee of the tenant?

In dealing with the question of a landlord's liability, even though the tenant is in actual occupation of the demised property, our Supreme Court, quoting the language of Taylor on Landlord and Tenant (8th Ed.) sec. 174, says: ''The rule in such cases is that the 'landlord's liabilities in respect of possession, are in general suspended as soon as the tenant commences his occupation. But when injuries result to a third person from the faulty or

defective construction of the premises, or from their ruinous condition at the time of the demise, or because they then contained a nuisance, even if this only becomes active by the tenant's ordinary use of the premises, the landlord is still liable notwithstanding the lease.' " [Felhauer v. City of St. Louis, 178 Mo. 635, 646. See, also, on this point, House v. Metcalf, 27 Conn. 631, 640; Hays v. Northern Pac. R. Co., 74 Fed. 279, 282; Arrowsmith v. Nashville, etc., R. Co., 57 Fed. 165, 178.] In 2 Wood on Landlord and Tenant, sec. 381, p. 869, it is said that while the Landlord is not liable for injuries from defects arising during the term, yet "when the premises, at the time when they are leased are in so defective a condition as to be *per se* a nuisance, especially when they are leased for a *quasi*-public use, the landlord is responsible for injuries resulting either to the tenant or *third persons* lawfully upon the premises therefrom." [Author's italics.]

In Carrigan v. Stillwell, 17 Maine, 247, 250, it was held that a landlord who rented a building without fire escapes was liable for the death of one caused by such lack even though the building was at the time in the possession of the tenant. It is also held that the landlord, as owner of a building, is liable to employees therein for failure to have had fire escapes constructed which the statute requires. [Willy v. Mulledy, 78 N. Y. 310; Steirert v. Coulter, 102 N. E. 113, 116; McLaughlin v. Armfield, 12 N. Y. Supp. 164; Johnson v. Snow, 201 Mo. 450.] While fire escape cases may not be directly and wholly in point, yet by analogy they present parallel reasoning which supports the theory of liability herein considered, and are therefore deemed to be applicable. For section 6786 does not say who shall provide the guards and section 6806 says any owner who aids or assists in a violation of the statute commits an offense. Here the defendants, as landlords, lease a *going concern*, an operative laundry, the machinery of which they are maintaining in a condition forbidden by the statute, and they lease it to a

tenant *for the purpose* of *operation* and knowing for a certainty that it will be operated by employees. Under the above statutes and the general law regulating liability for a violation thereof, it would seem that they would have no more right to *lease* it in that condition than they would have to *operate* it in that condition.

In Tvedt v. Wheeler, 70 Minn. 161, 167, the statute required that open places necessary for the operation of an elevator should be guarded. A "wheel hole," through which a cable on pulleys ran up and down through the floor to the ceiling, was not guarded. In that condition the building (just as in this case the laundry machinery) was leased to a tenant, and while it was in the latter's possession, the plaintiff was hurt, but nevertheless the landlord was held liable. The court, while disclaiming a decision that the statute imposed a continuing duty upon the landlord, said:

"The question arising upon the facts of this case is whether the owner of the building, who, while the building is in his possession, neglects to comply with the statutes, as to dangerous appliances which it is practicable to guard and which are a part of the building itself, who turns it over to his lessee with no fence or guard about such appliances, is liable to an employee of lessee, who is injured by reason of the fact that no guard was ever placed around them by either the owner or the lessee."

The court in the above case further said:

"The purpose of the statute is plain. It is intended to guard human life and protect human bodies from being mangled. It is a police regulation founded upon sound public policy, and courts ought not to strain or restrict by construction its language so as to impair its useful operation. It should be construed so as to effectuate the wise and humane purposes of its enactment. While the statute does not impose the duty of guarding such appliances upon the owner by name, its terms being positive and sweeping that such appliances shall be so guarded, yet there is no reason why the owner of a building should not be required to comply with

the statute, as to such dangerous appliances as are a part of his building, before he delivers the possession of the building to his lessee; and we so hold. The duty, in the first instance, rests upon the owner to construct guards about such appliances, even if it should be held that the continuous duty rests upon the lessee to keep them guarded while they are in his exclusive possession and control.''

· To the same effect see, also, 2 McAdam on Landlord and Tenant, p. 1614, sec. 10; 1 Tiffany on Landlord and Tenant, p. 680, sec. 102. It would seem that if, in the above quotation, the words ''laundry machinery or business'' (the subject-matter of the lease here), be substituted for the word ''building'' the language would fit this case like a glove upon the hand. Section 6786 says such machines as the one in question shall be guarded when possible without saying who shall be required to place or maintain the guards. Section 6606 is very sweeping in its terms and makes every one who assists, or aids, or abets the violation of the statute liable. That, it seems to me, means to include, and does include, every person who is a party to putting the unguarded machinery into operation or the main'a'.ai condition.

Defendants, however, in addition to contesting the soundness of this view, say that plaintiff's petition is not founded upon any such theory. If the petition is broad enough to cover defendants as owners of the plant and machinery, then it seems, at least to the author hereof, that it is not a question of the pleading in the petition, but rather a matter of the defendants failing in their defense that they were landlords, having leased the business and machinery in that unguarded condition ten days prior to the injury. There is no question that the machine was ungarded both at the time of the injury and of the so-called lease.

The petition, while it does plead the statute and charges the defendants as owners of the property, also charges them with being the operators of the laundry

as copartners and charges them with the duty of maintaining a guard and of thus neglecting the duty they owed to plaintiff in the relation of master and servant existing between them and the plaintiff. So that it may be proper, in order to determine whether plaintiff made a case on the petition as it now stands, to examine into plaintiff's other contention, namely, that notwithstanding the instrument called a lease, the defendants did *not* assume the relation of landlord but continued the business, retaining an interest therein and a control thereover, either as partners with Fredericks or as his employers.

The evidence shows that the defendants, for some time prior to December 29, 1917, owned the machinery in question and operated the laundry under the name of "The Richmond Steam Laundry." About six or eight weeks prior to the above-mentioned date, Fredericks, a man of no means and a stranger in that community, came to Richmond and was employed by the defendants as their foreman in the laundry. The defendants were engaged in mercantile and other pursuits and did not perform the actual work of running the laundry at any time. They claim that the laundry was not paying, and finally on December 29, 1917, they, instead of closing the laundry, leased it to Fredericks, under an instrument which reads as follows:

"This contract made and entered into this the 29th day of December 1917, by and between R. K. and John M. Marshall, parties of the first part and Joseph Frederick, party of the second part.

Witnesses, That the parties of the first part have this day leased to the party of the second part the Richmond Steam Laundry and grounds, being on Lot One (1) in Marshall's Addition to the City of Richmond, Ray County, Missouri, and has taken a list of articles on hand to be accounted for by the second party to the first parties. This lease to continue from month to month, and either party, by giving five days notice can terminate the term for the next succeeding month. The second party

will pay to the first parties, as rent thereon, both for the lot, fixtures and appliances, a sum equal to one-half of the net profits in each month. The second party will keep a book account of his expenses and receipts and balance them on the 29th day of each month. Any failure on his part shall operate as a release of this contract upon request of the first parties, in which event the second party agrees to quit and surrender the peaceable possession of said leased premises to first parties, their heirs and assigns, without notice and also to account for all moneys in his hands received as net proceeds, and will pay to first parties one-half of said amounts. Second party can employ his own men and help by the month making their term expire on the 29th of each month. This contract to run not exceeding twelve months from this date, at which time second party will surrender the leased premises to first parties, their heirs, and assigns, unless this contract be endorsed in writing for a period of one year more. Contract not to be sublet, or any one else substituted.''

On its face, the written instrument may, and perhaps does, *appear* to be a lease, and tends to show, so far as the instrument itself goes, that defendants did not operate the laundry, but that the same was to be operated by Fredericks as their tenant.

But it must be remembered that even if the written instrument appears to be a straightout lease with nothing on its face to indicate otherwise, nevertheless, the plaintiff, *not being a party to it,* is not *conclusively* bound thereby. He is free to vary its terms by oral evidence, that is, to show by oral testimony that the status between defendants and Fredericks, at least as to the operation of the laundry, was not that of landlord and tenant, or he can show that, notwithstanding the terms of the written lease, the same was subsequently so modified and changed by mutual oral agreement that the operation of the laundry thereafter was not Fredericks as a tenant with defendants as landlords, but that the operation thereof was participated in by defendants as parteners

or as employers of Fredericks and the plaintiff. It is well settled that, where the suit is not between the parties to an instrument nor based thereon, one can question the instrument itself and dispute the status it apparently creates and show that as an actual fact the status was otherwise. [McKee v. St. Louis, 17 Mo. 184, 190; Cordes v. Straszer, 8 Mo. App. 61; Luckie v. Bennett, 141 S. W. 706; 17 Cyc. 749, 750.]

And even though the written agreement was in fact a lease, yet it was within the power of the parties to modify it by parol, and if they actually did operate the laundry under an entirely different arrangement or agreement, their former written agreement was thereby abrogated. In other words, plaintiff's rights are to be determined by what they actually did and not by what they said to each other, in the written instrument, would be done. [Sanders Pressed Brick Co. v. Barr, 76 Mo. App. 380, 386; Pim v. Greer, 64 Mo. App. 175; Boyd v. Camp, 31 Mo. 163; Polk v. Western Assurance Co., 114 Mo. App. 514, 518.]

It must also be borne in mind that the verdict of the jury in this case is in plaintiff's favor. Hence, if there is any substantial evidence to support it, on the issue here under consideration, the plaintiff must be allowed to prevail. In other words, defendants cannot have the judgment overturned merely on the theory that the terms of the written lease itself shows, *as a matter of law,* that defendants were landlords and that Fredericks was the operator of the laundry as their tenant. This being true, the only question we have to determine is whether there was evidence in plaintiff's behalf tending to show that notwithstanding the writing, defendants actually operated the laundry as their own, Fredericks and plaintiff being their employee. We are of the opinion that there was such evidence, and when we connect it with the circumstances and reasonable inferences to be drawn from all the facts, it is clear the verdict is based on substantial evidence.

In the first place the business was owned and run by defendants to within ten days of the injury. The

business was conducted after the lease just like it was before the lease, except that Fredericks' pay was increased to one-half the net profits and he was given a little broader authority. After the so-called lease was made, the business was still run in the name of the defendants. This last fact is strenuously controverted, but the whole evidence on the subject, and which both parties rely upon, was given by one of the defendants when, in giving the name under which the laundry was operated after the so-called lease, he said it was operated "Just like it always had" and when asked what was the name he replied "R. K. and J. M. Marshall, it went by the name of the Richmond Steam Laundry." In view of this evidence coming from one of the defendants themselves, and in view of the further fact that both before and after the lease all the money from the laundry business was banked in the name of R. K. and J. M. Marshall and was paid out by them on checks signed the same way, it would seem that under the verdict, it could be safely said that the laundry was then operated as it always had been in the name of "R. K. and J. M. Marshall" using also the trade name of the "Richmond Steam Laundry."

Not only were all the employees of the laundry paid by defendants with checks drawn in their own names, but they paid for all the supplies in the same way.

The defendants owned the "fluid" goods that were being consumed in the laundry. True, the lease says Fredericks was to "account" for them, but this is not saying they are purchased and will be paid for, but that he will render an account of goods that do not belong to him. These would have to be taken into account in order to ascertain the net profits. If any of these goods were replenished they were paid for, not by Fredericks but by the defendants out of the "laundry money" for he, Fredericks, says the defendants paid the "current expenses" out of the same. It was not even called Fredericks' money but "laundry money." The defendants collected part of the cash taken in from the laundry, and the bal-

ance of cash that they did not collect was turned over to them and all of it was, as heretofore stated, banked in their names. The record also shows that all of the repairs made on the machinery were made by defendants.

The view that the parties to the so-called lease did not regard it as such, or, if they did, they mutually agreed to disregard it as a lease, and the business was carried on as before with Fredericks receiving as his pay one-half of the net profits, is further supported by the following further facts.

The so-called lease provided that the relationship between defendants and Fredericks could be terminated at the end of any month on five days notice. So that if a tenancy was created it was practically a tenancy at will, which in itself would seem to cut the main element of a lease down to the vanishing point and to coincide with the view that the parties did not have any real intention to create a lease. Furthermore, it would rob the so-called tenant of any incentive to make repairs or put on guards and impel him to run the plant in the condition it was. But it does not seem to have been contemplated by the parties, at least in the light of what was done after the so-called lease was signed, that in running the plant Fredericks was to go in business for himself. Again, the instrument provided that Fredericks could hire his own help. Of course, he could if the instrument were really a lease and the parties intended that Fredericks should himself run it as tenant. In that event such a provision was wholly unnecessary and useless as he would have that right anyway. But if the parties were contemplating that it should be run in some other capacity or relationship, it is easily apparent why such a provision should be inserted. The instrument provided that Fredericks should keep the books of the business but it is not shown that he did and the inference is strong that the defendants kept them since they were the only persons who had the data for that purpose. The instrument provides that *Fredericks* shall pay one-half of the net profits as rent; but as a matter of fact, the

*defendants* paid *him* one-half of the net profits; and had there been any losses, or if there were any, the defendants would have to bear them regardless of any provision in the so-called lease, even if there had been any therein on that subject.

We do not wish to be understood as holding that proof of the matters hereinabove stated conclusively show that defendants were, in reality, operating the laundry; nor do we say that some of those facts taken singly are not consistent with the idea of the relation of landlord and tenant; but what we do say is that taken all together they constitute a substantial basis for the verdict. And since the issue was submitted to the jury and they have found a verdict on substantial evidence to support it, we are not justified in setting it aside. The judgment is therefore affirmed. The other judges concur. *Bland J.*, concurs in result only as shown in his separate opinion.

BLAND, J. (concurring.)—I. concur in the result but not in that part of the opinion holding defendants liable on the theory that they were landlords.