A. P. DARLINGTON v. RAILWAY EXCHANGE BUILDING, INC., a Corporation, Appellant.—No. 38983.—183 S. W. (2d) 101.

Division Two, October 9, 1944.

Rehearing Denied or Motion to Transfer to Banc Overruled, November 13, 1944.

570

*Joseph N. Hassett* and *Ernest E. Baker* for appellant.

*Russell J. Horsefield, Wilbur C. Schwartz* and *C. O. Inman* for respondent.

574

ELLISON, J.—The respondent recovered $10,000 damages from appellant in the circuit court of the City of St. Louis for personal injuries sustained in falling down a dark stairway leading from the seventeenth to the sixteenth floor of the Railway Exchange Building in that city. The stairway was designed as a fire escape and had an outside window, but the casualty occurred at night. The petition alleged that appellant for a long time had knowingly and negligently permitted the stairway to be used as a common passageway by tenants and their invitees though it was dangerous in design, and unillumined notwithstanding it was equipped with wiring and fixtures for that purpose; and also that appellant had failed to keep the stairway in safe condition, and to inspect it and warn respondent.

Appellant's broadest assignments of error on this appeal are: (1) that the trial court erred in refusing to sustain appellant's demurrer to the evidence at the close of the whole case; (2) that as a matter of law there was no causal connection between the negligence alleged and the injuries sustained; (3) that the appellant was guilty of contributory negligence as a matter of law. Other assignments complain: (4) of the giving and refusal of instructions; (5) and that the verdict was excessive and resulted from passion and prejudice on the part of the jury.

The Railway Exchange Building occupies an entire block, with an inside court, in the downtown section of the city, and is about 350 feet square and twenty-one stories high. The lower twelve stories are occupied by a large department store; the upper nine stories by offices, of which there are about 900. A common hallway seven feet wide extends clear around each of these nine stories between the inner and outer office rooms. Midway of the north and south sides, respectively, are batteries of nine elevators with an adjacent lighted stairway having wire glass doors and marble steps, all for the use of tenants and the interested public. One elevator on the north side continues in service until 11:45 P. M.; and one on the south side runs all night.

The stairways are also available as fire escapes, as indicated by red electric light globes so marked.

Midway on the east and west sides of the building, respectively, are stairways originally designed for use exclusively as fire escapes. The one on the east side of the seventeenth floor is involved here. It was next to the outside wall, with a window on each floor. An open cross-hall five feet wide and twenty feet long leads off eastwardly at right angles from the main hallway to a solid panel metal firedoor, plainly marked FIRE ESCAPE in letters four inches high. Over the entrance to this narrower cross-hallway, there is a red ceiling globe with the words "fire escape" printed thereon. But otherwise that hallway and the main hallway are finished alike, with marble floors and wainscoting, and two ceiling electric lights.

The stairway well is on the north side of the north wall of the cross-hall. The firedoor swings eastwardly and to the right from the end of the cross-hall *into* a small, almost square vestibule, dimensioned about 54 inches east and west and 61½ inches north and south. Thence another similar firedoor swings *out* from the north wall of the vestibule, to the right in a northeast quadrant, entering the stairway landing. In other words, a person going from the cross-hall to the stairway would walk east entering the vestibule, and then turn to the left or north passing through the second door into the stairway landing. Both doors would swing *away* from him and are self-closing, being actuated by springs. When the outer vestibule door closes the light ▬▬ from the hallway is shut off, leaving the vestibule and stairway landing in darkness. The outer edges of the two doors, when swung past each other, clear about one foot. The landing is about four and a half feet wide and seven feet long, extending north and south. From the west or left side of this landing the descending and ascending flights of stairs feed off, the former being on the south and within seven inches of the left side of the entrance door. The angular spring resistance of the second door tends to make one veer toward the descending stairway. According to the architect witness Wishmeyer, an exhibit photograph of the

steps showed they had been used in the sense of being worn. A floor plan of the described premises follows:

With reference to the character of the finishing and equipment of the stairway and appurtenances, as tending to disclose whether a limited fire escape use of them was intended. The walls, floors and steps are plain concrete but painted—the walls in two tones of brown. The stairway is equipped with hand rails, or bannisters, on both sides. There is a light fixture in the ceiling of the vestibule and the stairway shaft had been wired and equipped with fixtures and lights when the building was erected in 1912, but no lights had been maintained since 1915. This was because vandals stole them and even tore off the fixtures. Lights were reinstalled in 1943, two years after the casualty, following an examination by a City Inspector. This testimony came from the Inspector and from Mr. Eddins, chief engineer and assistant manager of the building.

The latter also testified that the vestibule fire doors had been equipped with handles or levers—some device for opening them from the inside—about 1928. Mr. Wishmeyer, whose firm were architects for the building, testified it was bad practice to have opening devices on the inside of fire escape doors, because people in panic might blunder back into the building in case of fire. But Mr. Eddins, chief engineer and assistant manager of the building, explained the handles were put on to make it more convenient for building employees to go in and out on their different floors; and also because people would walk into the fire escape enclosure and couldn't get out, and then would hammer on the doors and get scared. Another assistant manager, Mr. Baker, recalled an occasion when some women had gone into it thinking it was a room, and became almost hysterical when they couldn't get back.

On the question of common and customary use of the fire escape stairway by tenants and their invitees. One tenant for 19 years, another since 1936, and another since 1939, all said they had used the stairway in going back and forth between floors not too far apart, for convenience and to avoid the loss of time consumed in going around to the elevators on the north or south sides of the building, a considerable distance away. They had seen other tenants, and persons outside of employees, do the same thing. Two of these witnesses stated they had followed that practice day and night. The third said he made night use of the stairway only infrequently. No instructions had ever been given by the building officers forbidding the practice, and there were no signs to that effect. Mr. Eddins, the chief engineer and assistant manager already referred to, said he had met some of the tenants going from floor to floor along the fire escape stairway and didn't tell them not to use it or try to stop them. But this was in the daytime when the light was good. He had never seen anybody doing that at night.

The facts immediately connected with the casualty were as follows. The American Blower Company occupied as tenant office rooms No's. 1711 and 1712 immediately south of the cross-hallway, as shown by the floor plan, supra. Mr. Thomas W. McMahon was in charge of this branch office. The appellant, 52 years old, was in charge of certain activities of the same company at Detroit. His income was partly dependent on his work in St. Louis. It manufactured equipment used in connection with steam boilers, and frequently had business with Babcock and Wilcox Company, manufacturers of boilers, which had offices in room 1915 on the nineteenth floor, only two doors north of the corresponding cross-hallway and vestibule on that floor. On the day and evening of May 8, 1941, Mr. McMahon and appellant, the latter having come to St. Louis for that purpose, were working on certain mechanical drawings. They borrowed some blue prints from the Babcock and Wilcox Company for use in that connection. They finished

about 10:30 P. M. Appellant's train for Detroit was due to leave at midnight and he had to go back to his hotel, and then to Union Station. Mr. McMahon and appellant left the office together, the former intending to return the borrowed blue prints.

To save time and as a matter of second nature McMahon went via the fire escape route, going along the main hallway, cross-hallway and vestibule. He had done it frequently before and had seen other people, the public doing the same in the daytime. First he testified he had not gone that way before at night; later he declared he had. He had started up the fire escape stairs to the other company's office with appellant apparently following him, when he heard a cry. Returning, he found appellant had fallen down the descending flight of stairs. Appellant testified he followed along about ten feet behind McMahon, and, seeing him go through the vestibule door witness did likewise, but this was after McMahon had passed out of view.

As long as the first swinging door remained open there was light in the vestibule and he could see the second door. He pushed that door open and automatically stepped forward without knowing what was on the other side, but supposing there would be a landing since McMahon had preceded him. Without his advancing foot touching the floor he fell down the stairway. The first door was closing when he was pushing the second door open. It was pitch dark in the stairway shaft. Theretofore he had always used the elevators but never the stairway. He chose the latter route on this occasion to save time and because he was following McMahon. For the latter reason he did not notice the fire escape markings on the first fire door and the read electric light globe. He had never been either authorized or forbidden to go that way.

On its first and general assignment, that the trial court erred in overruling its demurrer to the evidence, appellant contends the evidence failed as a matter of law to show the fire escape stairway and vestibule were a common passageway at night; and that it (appellant) as landlord by long acquiescence had impliedly invited tenants and their invitees to use them as such. Further appellant maintains that in any event it was not required to keep the vestibule and stairway lighted.

 To confine the case to the precise issues involved, it should be explained that appellant concedes it did in fact have custody and care of the vestibule and fire escape stairway; and that tenants and others did use them as a common local passageway in the daytime. It further tacitly concedes the well established rule where premises are let to several tenants and portions thereof, such as halls and stairways, are used by them in common, the landlord is held in law to have reserved such portions for the common use and to be responsible for the maintenance, care and reasonable safety thereof. Schneider v. Dubinsky Real Estate Co., 344 Mo. 654, 664(6), 127 S. W. (2d) 691, 696(15).

Also, the general rule is not questioned that the rights of the respond-
ent, as invitee of the tenant American Blower Co., were coextensive
with those of that tenant, as against the appellant landlord for its
negligence in failing in any duty to keep the stairway reasonably safe
—if there was such duty and failure. Duff v. Eichler, 336 Mo. 1164,
1169(3), 82 S. W. (2d) 881, 884(3). The same would be true if re-
spondent be regarded as an employee of the tenant. Tomlinson v.
Marshall, 208 Mo. App. 381, 387, 236 S. W. 680, 682(2). In other
words, if such duty was owing to the tenant it was also owing to the
respondent.

The only question open to discussion is whether the vestibule
and fire escape stairway were a common passageway at night, and made
such by an implied invitation of the appellant through its long stand-
ing acquiescence. It is conceded that appellant retained control and
care of the stairway and its entrance vestibule and the hallway leading
thereto; and that fires necessitating its use as an escape way would be
rare. One witness estimated they would be fifty years apart. An-
other said there had never been such a fire. The other facilities for
vertical travel in the building were comparatively remote from ten-
ants in the parts involved. And as a fire escape exclusively the stair-
way was idle. It is true, as respondent says, that the stairway ought
to have been lighted even as a fire escape alone; and that the conges-
tion of a panic stricken crowd in the dark, shut-in stairway at night
would be horrifying. But we reject that argument, since those condi-
tions are not a measure of the appellant's duty to light the stairway
as a common passageway at ordinary times.

The cross-hall leading to the vestibule and stairway was finished and
lighted in the same way as the main hallways, save for the two fire
escape signs, one on the red ceiling globe and one on the first fire
door. But these signs did not necessarily constitute warnings that
the stairway must be used exclusively for fire escape purposes either
in the daytime or at night. It was not unnatural that it should be used
also as a common local stairway in view of its convenience. There
is no dispute about the fact that it was adequately constructed for such
use in the daytime, save, possibly, that the descending stairway was too
close to the entrance door even then. And the fire escape signs may
well have been put up merely to show the *location* of the stairway in
case of fire, night or day. The two stairways adjacent to the two bat-
teries of elevators had similar red globe signs, although they admittedly
were used as common public stairways. If the elevators were not
running the stairways would be the only available exits. And the
one here involved would be conveniently accessible at other times.

There admittedly was an invitation for tenants to use the *building*
at night. The evidence for respondent shows tenants and invitees had
used the stairway as a common local passageway for years both night
and day, the latter with the knowledge of the appellant; and that no

notice or warning to refrain from that use had ever been given. Tenants were known to be there at night in numbers sufficient to require the use of two elevators up to 11:45 P. M. And there were no announced restrictions on their activities differing as between daytime and night. The Wabash and M., K. & T. Railroad companies had offices in the building, and so did the Mo. Pac. Ry. Co. up to 1928. Some of the Wabash offices were open at night. (These facts we neglected to state before.) We think it was a question for the jury whether the stairway was used as a common passageway at night with appellant's implied invitation by acquiescence.

The Argument in appellant's brief makes the point that witness Eddins' authority as appellant's chief engineer and assistant manager was limited to operation and maintenance of the building; and that he had no power to create tenancies or to grant rights and privileges to tenants. Thence it is contended that his knowledge of the use of the fire escape stairway did not constitute acquiescence binding appellant. No such point is made in the Assignments of Error or Points and Authorities in the brief, and no authorities are cited. But we find the following question and answer in the direct examination of the witness, in addition to his testimony that he was chief engineer and assistant manager in charge of elevators, fire escapes and hallways, and for the condition of them: ''Q. And what, if anything, as manager and supervisor of these hallways, what, if anything, have you done looking towards the discontinued use of these hallways by tenants? A. I didn't try to stop them. It was in the daytime and it was good light, you could see where you were going.'' He further said that now, with lights reinstalled on the stairway he wouldn't stop them at night; but that he had never seen them at night. There is no merit in this contention.

Appellant next asserts its mere passive acquiescence in the use of the fire escape stairway by some of the tenants in the building did not create a duty on its part to maintain the stairway in reasonably safe condition. The first case cited is Straub v. Soderer, 53 Mo. 38, 42-3. But a mere reading of that decision will show the opinion treated the injured third party there as a mere licensee who had entered without any invitation. He was not a tenant, and had gone along an alley at night and fallen into a cellar stairway when the regular route to the premises of the tenant he was seeking, was along another thoroughfare. The second case, Moore v. Wabash, St. L. & Pac. Ry. Co., 84 Mo. 481, 487-8, announces the same rule, and its converse applicable here. The same is true of the third case cited, Butler v. C., R. I. & P. Ry., 155 Mo. App. 287, 296-7, 136 S. W. 729, 732(4).

Both parties rely on decisions holding that when the landlord has extended an invitation to use his premises, the invitee is limited to the part thereof included within the invitation. Murphy v. Wolferman, Inc., 347 Mo. 634, 643(3), 148 S. W. (2d) 481, 485(5) and cases there

cited. Appellant refers to these decisions on the theory that the fire escape stairway involved here was not included within its invitation, the latter being limited to the elevators and the regular stairways adjacent thereto. Respondent invokes them as authority on the ground that appellant's invitation did include the vestibule and stairway. We have held that was a question for the jury. So we are unable to agree with either of appellant's contentions stated in this and the last paragraph.

The next assignment is that in any event appellant was not required by law to keep the stairway lighted, there being no agreement to do so, and no statute or proof of any ordinance so requiring. Two recent decisions are cited on that point. The first, decided by Division 1, is Lambert v. Jones, 339 Mo. 677, 690(5), 98 S. W. (2d) 752, 760(10, 11). The second case, decided by Division 2, is Barber v. Kellogg, 123 S. W. (2d) 100, 101-2. These cases are in point, but we think them distinguishable. The common law rule is as they state. But the authorities are divided on the question whether the landlord is bound to light common halls or stairways if they are inherently dangerous *in construction,* and not merely with respect to some transitory condition. An increasing number of decisions from the various jurisdictions seem to be coming to that view.[1] See also McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 1169, 298 S. W. 226, 232(3).

The Lambert case took that into account, giving two reasons why it was exempting the landlord from responsibility there: (1) he had never assumed the duty of lighting the stairway involved; (2) and there was no evidence showing the stairway was inherently dangerous in construction. And nearly a year later the landlord was held liable in one case for a dangerous condition in a hallway, resulting from insufficient light. Sherman v. Alexander & Sons (St. L. Ct. App.), 108 S. W. (2d) 616, 619(1). In the instant case both the conditions mentioned in the Lambert case were absent: the landlord had previously lighted the fire escape stairway; and the stairway was inherently dangerous in construction, because the top of it was only seven inches to the side of the entrance door, and the angle and resistance of the door tended to divert the user in that direction when he could not see at night.

The next three assignments are that the darkened condition of the stairway was known to the respondent; and that he either assumed the risk of injury or was guilty of contributory negligence as a matter of law. If the risk was obvious and known to him, he assumed it. If it was not obvious, but because of the darkness he was bound as a reasonably prudent man to proceed with caution

[1] 36 C. J., sec. 891, p. 214; 32 Am. Jur., sec. 701, p. 576; Annotations: 97 A. L. R., p. 232; 75 ib., p. 170; 58 ib., p. 1419, 39 ib., p. 302; 25 ib., p. 1312.

and failed to do so, then he was guilty of contributory negligence. But we cannot uphold either of these contentions as a matter of law. Neither can we agree that since respondent did not know of the customary use of the fire escape stairs as a common passageway he could not rely on it.

He was the guest or invitee of his fellow worker McMahon, who was familiar with the premises, and had a right to rely on the latter's guidance. McMahon did not warn or caution him, but proceeded ahead as if the way was clear, respondent following about ten feet behind. He saw McMahon go through the first fire door and did the same. By the brief light from the hallway he saw the second door and went through that, thinking there would be a stairway and a landing on the other side. Probably he would have sought to get his bearings after he reached that point, but he didn't have a chance. The angle and resistance of the door swerved him to the left and toward the stairway only seven inches away. He fell down the stairs before he had put his foot on the floor. It was not a case of choosing an unsafe way when a safe way was available. There are substantial reasons for believing he had a right to think the way was safe up to the point where the casualty happened; and that McMahon and the landlord were both at fault, if anybody. We hold the questions on these issues were for the jury.

Another assignment is that there was no causal connection between the negligence alleged and the injury sustained. The negligence referred to is the maintenance of the stairway in an inherently dangerous condition due to its construction within seven inches of the angular, pressure resisting door, which made a pitfall in the dark. Appellant's theory is that since respondent testified he "automatically" stepped through the door, he would have fallen down the stairs even though the stairway well had been illumined. Plaintiff's Exhibit B, a photograph, indicates respondent could have seen the stairway through the opened door if the stairway shaft had been lighted. As the door was opening his first view would have been toward the stairway and the bannister at the landing. At any rate, we are unable to agree as a matter of law that the result would have been the same whether the stairway was dark or lighted.

The next assignment complains of respondent's instruction No. 1. The first objection is that it did not require the jury to find respondent knew of the custom to use the stairway as a common passageway. We passed on that point in the second and third preceding paragraphs. The second objection is that the instruction assumed the following disputed facts: (1) that the fire escape stairway was a common stairway; (2) that respondent was "an invitee in the stairway"; (3) that the stairway was in dangerous proximity to the vestibule doorway. The instruction as printed in the abstract is almost

two and a half pages long, and we shall not set it out in the opinion. We have counted the lines in it and there are 84.

For the information of counsel and the litigants we hold that the first question, whether the stairway was a common passageway, was squarely submitted in lines 11 to 25 and required a finding that the stairway was in the possession and control of the appellant and was used by the tenants in common with its knowledge and consent. The second question, whether the respondent was an invitee, was not submitted in terms, but lines 33 to 36 required a finding that respondent was an employee of the tenant, and that his duties required him to go from the seventeenth to the *eighteenth* (nineteenth?) floor of the building. We further remind counsel for appellant that page 12 of the Argument in their brief concedes respondent "no doubt was an invitee of defendant's tenant for the purpose of going to the office of such tenant," and that "as such invitee he had the right to use the means of ingress and egress from his employer's office to the other tenant's office which were provided by (appellant) for that purpose." The above part of the instruction did not submit the question whether the fire escape stairway was included in the invitation to respondent as invitee, and did not have to.

The third question, whether the stairway was in dangerous proximity to the vestibule doorway, was submitted in lines 41 to 52, requiring a finding that the stairway was ██ so constructed and maintained by the defendant as to be within seven inches of the doorway, *and* so close to the doorway as to be in dangerous proximity thereto, in that persons passing through the doorway would be unable to gauge the nearness of the stairway and in danger of stepping into it. We find no fault with the instruction except its length.

██ Another assignment complains of the refusal of appellant's Instruction A on assumption of risk. That instruction told the jury, in substance, that if appellant was furnishing elevator service at the time between the floors in question, to respondent's knowledge; and that respondent further knew the stairway shaft was dark prior to walking into it, but declined to use the elevator service and voluntarily chose to go by way of the stairs when it was dark, then he assumed the risk from the darkness. The instruction wholly omits any reference to the landlord's implied invitation to use the stairway and the implied representation that it was reasonably safe in the respects which caused the casualty, notwithstanding the darkness. It further omits any reference to respondent's right to rely on the guidance of tenant McMahon. The refusal of the instruction was not error.

██ The final assignment is that the verdict for $10,000 was excessive and the result of passion and prejudice on the part of the jury. Respondent sustained a comminuted fracture of the surgical neck of the humerus. He received first aid treatment in his employer's office and was then taken to St. Mary's Hospital where X-rays

were taken and a cast placed on his arm. He is right-handed and the injury was to his left arm. He remained in St. Mary's Hospital two days, and then departed for Detroit, where he immediately went to the Women's Hospital and remained there ten days. In Detroit X-rays were taken and the cast which had been placed on his arm in St. Louis was removed and the fracture again reduced and his arm placed in an aeroplane splint, where it remained for seventeen weeks. After the splint was removed he was placed under anaesthetic four times and an attempt made to break the adhesions in his shoulder, elbow, and wrist. Thereafter he received massage and heat treatments to the arm from about September 20th to about the middle of December. The casualty occurred on May 8.

The treatments to his arm were painful, and the attempt to break the adhesions was a painful procedure, and he suffered much pain at the time of his injury. He has about a ten degree limitation of extension at the elbow joint, a loss of twenty-five per cent rotation in his left forearm, and a loss of twenty-five per cent motion in his shoulder joint. He has incurred approximately $1,000.00 in expense in caring for his injury. Respondent did not pray or prove loss of current wages and future loss of earnings. His evidence tends to show that the disability in his left arm will be permanent.

He was a mechanical engineer and his profession required him to climb and crawl over and through portions of power plants he is inspecting. He does not claim his injuries disqualify him for that work, or that his earnings will be less. The basis for his damages are plain, suffering, impairment in capacity to labor and his $1000 outlay for medical expenses. The case respondent cites in support of the $10,000 verdict is Cordray v. City of Brookfield (Mo., Div. 1), 88 S. W. (2d) 161, 166 (8, 9). But in that case the injuries were to the back, kidneys, vertebrae and hip. On the first trial the verdict was $10,000; on the second, $11,000. The facts are not in point. The other case referred to is Kleinlein v. Foskin, 321 Mo. 887, 907, 13 S. W. (2d) 648, 657(14) which holds that damages may be recovered for diminution or impairment of capacity to labor, although there may, in fact, be no actual loss of earnings.

On the other hand, appellant cites several decisions dealing with arm injuries. In Jenkins v. Mo. State Life Ins. Co., 334 Mo. 941, 950, 69 S. W. (2d) 666, 671-2(15), a 53-year-old woman earning $250 to $300 per month suffered a broken arm causing permanent injury due to an ankylosed elbow, loss of full use of fingers and inability to close her hand entirely. A $10,000 verdict was reduced to $8,000. Appellant distinguishes it because she had no surgical operations and incurred only $144 expense. In Grange v. C. & E. I. Ry. Co., 334 Mo. 1040, 1052-3, 69 S. W. (2d) 955, 961(12), the plaintiff, 50 years old and earning $165 per month, suffered an injury which necessitated the amputation of his entire left hand. He complained of pain

and impairment of shoulder motion. A verdict of $20,000 was reduced by the trial court to $17,000, and by this court to $10,000. Appellant distinguishing it says there was no unusual pain, and no expense. In Tash v. St. L.-S. F. Ry. Co., 335 Mo. 1140, 1165-8(8), 76 S. W. (2d) 690, 700(15), an engine hostler 38 years old and earning $5.63 per day, suffered an injury to his right arm and [109] shoulder causing pain and interference with the use of the arm and hand grip, though the opinion says the evidence in part was unsatisfactory. It resulted in "subdeltoid bursitis." A verdict of $8,000 was reduced to $5,000. His expense was only $70.

The evidence here shows considerable initial pain followed by four painful surgical treatments, each requiring an anaesthetic. He was under treatment of one kind or another for about seven months. He testified that he cannot raise his left arm as far as his right, and cannot straighten his elbow. But as to pain, the abstract quotes him as follows in narrative form: "His arm still pains. He usually wakes at night if he gets on his left side. He has been entirely free of pain in his left shoulder and arm since the accident. He has no pain in his left shoulder when he doesn't try to use it, but when he tries to use it at certain times he does have pain. His work requires him to use his left arm and shoulder in a physical way. He would say he cannot do the work with his left arm and shoulder that he did before the accident. . . . He cannot climb around due to limitation in the arm and also the strength of the arm and the pain in it."

Considering all these factors, we think the verdict should be reduced to $8,000. If respondent will enter a voluntary remittitur of $2,000 within fifteen days, the judgment will stand affirmed for $8,000; otherwise the judgment is reversed and the cause remanded.

Affirmed conditionally. All concur.