Gaston S. McCloskey, Appellant, v. Salveter & Stewart Investment Company.—298 S. W. 226.

Division One, September 16, 1927.

1. **NEGLIGENCE: Public Building: Invitee: Keys.** The furnishing to tenants of rooms on the various floors, by the owner of a semi-public building several stories high, of keys to the outer door and usual entrance to a hallway on the ground floor, in which is a stairway and elevator, amounts to an implied, if not an express, invitation to such tenants, and their employees, to enter the building through such door, for the purpose of using the stairway, and perhaps the elevator, or both, after the hall lights have been customarily extinguished for the night and the outer door locked, where the owner retains control of the hallway, the lighting thereof and of the elevator.

2. ———: ———: **Duty to Light Entrance Hall: Fall into Elevator Well.** The owner of a building several stories high, who rents its various rooms to different tenants, but retains control over a hallway entrance on the ground floor and of the passenger elevator therein, owes a duty to invitees to keep the hallway and the approaches to the elevator lighted, and the door to the elevator shaft closed, and is liable for injuries to an invitee due to the owner's failure to light the approaches to the elevator, where the lock on the door is broken and the door, because of such or other like defects, will not fasten, and where such defects have existed for such length of time as to amount in law to notice thereof to the owner, and the invitee, groping

his way through the unlighted and dark hallway, from the entrance door to a stairway therein, without negligence on his part, falls through the open doorway into the elevator well.

3. ——: Elevator: Permissive Use: Independent Negligent Act of Third Party. An invitee has the right to assume that the owner and operator of a passenger elevator in a public or semi-public building will exercise a high degree of care to see to it that the approaches to the elevator are reasonably safe, and that the doors to the shaft can be safely and securely locked, and are not negligently left open; and the owner, who retains control of the elevator and the approaches thereto, is liable for injuries to an invitee who falls through the open doorway of the elevator shaft, for the negligence of one of several tenants who is knowingly permitted by the owner to make use of the elevator and who negligently leaves open the door. The known permissive use of the elevator by a tenant renders the landlord liable for the negligence of such tenant in failing to close the doorway to the shaft, and the owner is not to be excused on the theory that the injury was caused by the independent negligent act of a third party. The primary cause was the failure of the owner to see to it that the approaches to the elevator were lighted and that the doorway to the shaft was closed and reasonably safe, and the negligence of the permissive operator in failing to close the door was set in motion by that primary cause and was but a link in the unbroken chain of causation which produced the injuries.

4. ——: ——: ——: Proximate Cause: Chain of Causation. The proximate cause of a personal injury is the efficient cause which sets in motion the chain of circumstances leading up to the injury, and which, in natural and continuous sequence, unbroken by any new or independent cause, produces the injury. The primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the one so operating on the others as to make the injury the result of the primary cause.

5. ——: ——: ——: Third Party: Concurrent Negligence. If the injury to an invitee is the result of the combined negligence of the defendant and the negligent or wrongful act of a third party, for whose act the plaintiff is not responsible, the defendant is liable.

6. ——: Contributory: Knowledge: Defective Doorway to Elevator: Fall into Elevator Well. Knowledge by an invitee of the unlighted and dark condition of the hallway entrance to a building and of his proximity to an elevator shaft therein is not conclusive that he was not exercising due care when he fell through the open doorway into the elevator well. Nor is the fact that he knew that the hallway was not lighted and he did not provide himself with matches to guide him to a stairway through the dark hallway. Nor is the fact that six months before he had observed that the lock upon the door to the elevator entrance was broken, where he did not thereafter observe the defects or use the elevator. Nor do these facts, taken in connection with the other fact that when he entered the hallway in search of a stairway therein, he felt his way along the wall leading to the elevator instead of the wall on the opposite side of the hallway, authorize a ruling that he was guilty of negligence as a matter of law.

---

Corpus Juris-Cyc. References: **Landlord and Tenant**, 36 C. J., Section 891, p. 214, n. 71; Section 894, p. 215, n. 79; Section 918, p. 229, n. 70; Section 975; p. 253, n. 47; Section 976, p. 253, n. 51; p. 254, n. 52. **Negligence**, 29 Cyc., p. 491, n. 45, 46; p. 514, n. 96.

Appeal from Circuit Court of City of St. Louis.—*Hon. John W. Calhoun,* Judge.

REVERSED AND REMANDED.

*Abbott, Fauntleroy, Cullen & Edwards* and *Rice & Straub* for appellant.

(1) If the owner elects to keep the shaft opening unguarded he must keep the surroundings well lighted, so that a person exercising due care for his safety will not step into it, and if he fails to do so he is liable for the ensuing negligence. 9 R. C. L. 1241. (2) It was the duty of defendant, in operating the elevator, to exercise the utmost care and diligence, and to provide and maintain proper and secure fastenings to the doors opening into the elevatorway that could not be opened or controlled from the outside. Colorado Inv. Co. v. Rees, 42 Pac. 42; Burner v. Higman & Skinner Co., 103 N. W. 803. (3) The locks on the elevator door in question were so defective that if the door did not rebound anyone wanting to use the elevator "would just walk in and open the door and use it." Therefore, it was "wholly immaterial whether such door was opened by some third person," provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastenings to its elevator door; for, had it performed its duty in the premises, such interference by a third party would have been impossible. Hence its negligence necessarily concurred in, and constituted an essential factor in, causing the injury. Colorado Inv. Co. v. Rees, 42 Pac. 45. (4) "It is well settled by the adjudged cases that where an injury is the result of the combined negligence of the defendant and the negligent or wrongful act of a third person, for whose act neither the plaintiff nor the defendant is responsible, the defendant is liable, when the injury would not have happened, except for his negligence." Shearman & Redfield on Negligence, sec. 10. (5) "A person has the right to assume that the owner and operator of an elevator will exercise that high degree of care that the nature of the business demands, and will see to it that the approaches thereto are reasonably safe, and that the doors to the shaft can be safely and securely locked, and are not negligently left open; and that he may safely enter when he finds the door open, without stopping to make a special examination. Tousey v. Roberts, 114 N. Y. 312. When the motion was interposed, the evidence before the jury tended to show that, because of the broken lock on the elevator door, the door was standing open; and that, owing to the inadequate light in the hallway, plaintiff failed to discover the absence of the elevator. Whether, under the circumstances thus shown, he exercised that degree of

care which persons of ordinary prudence would exercise on approach-
ing and entering the elevator, was at least a question of fact for the
jury. Colorado Inv. Co. v. Rees, 42 Pac. 43. (6) The owner of an
elevator must use the highest degree of care, vigilance and precaution,
both in providing and managing it. 9 R. C. L. 1249; Lander v. Horn-
beck, 179 Pac. 21; Luckel v. Building Co., 177 Mo. 628. (7) The
permissive use of the elevator to any who desired was negligence.
Lander v. Hornbeck, 179 Pac. 21. (8) It is not contributory neg-
ligence not to look for danger when there is no reason to apprehend
any. People's Bank v. Morgolofski, 32 Am. St. 411.

*Foristel, Mudd, Hezel & Habenicht* for respondent.

(1) The record fails to show any negligence on the part of the
defendant proximately causing injury to the plaintiff. Katz v.
Development Co., 215 Mo. App. 662; Hake v. Stove & Range Co., 234
S. W. 1061. (2) It is not shown that defendant owed plaintiff any
duty to keep the hallway lighted after 6:30 o'clock in the evening
when the plaintiff entered into it to go up the stairway. Morse v.
Maddox, 17 Mo. 569; New Era Mfg. Co. v. O'Reilly, 197 Mo. 466;
Dean v. Murphy, 169 Mass. 413; Gleason v. Boehm, 58 N. J. L. 475;
Jucht v. Behrens, 7 N. Y. Supp. 185; 36 C. J. 36, sec. 636; 16 R.
C. L. 1041, sec. 560; 14 Ann. Cas. 764, note; 19 Ann. Cas. 667,
col. 1, note. (3) Plaintiff directly contributed to his injuries by
negligence on his own part. Gleason v. Boehm, 58 N. J. L. 475; Hilsen-
beck v. Guhring, 131 N. Y. 674; Miller v. Mencken, 26 N. Y. Supp.
801; Jucht v. Behrens, 7 N. Y. Supp. 185; State ex rel. v. Trimble,
279 S. W. 60.

SEDDON, C.—Action by plaintiff (appellant) to recover damages
in the sum of $25,000 for personal injuries suffered by plaintiff and
alleged to have been caused by the negligence of defendant (respond-
ent) while plaintiff was rightfully and lawfully within the first or
ground floor hallway of defendant's business building at 507 North
Broadway, in the city of St. Louis, known as the Stewart Building.
Plaintiff fell into an open elevator shaft or well in the building,
which was owned and operated by defendant corporation. The neg-
ligence charged against defendant in the petition is as follows:

"Plaintiff states that defendant at all times herein mentioned was
in possession and control of the elevator shaft, hallway and elevator
herein mentioned, and knew, or by the exercise of ordinary care
should have known, that tenants were accustomed to occupy their
offices in said building in the evening, and that many of them and

others were at all times herein mentioned accustomed to operate in the evening the elevator herein mentioned.   . . .

"Plaintiff further states that the only entrance to this building is from the Broadway side, and that the said defendant has provided an elevator and also a stairway in said entrance for the purpose of enabling persons having business in said building to go to any of the upper stories thereof, and that the stairway adjoined said elevator shaft to the southeast.

"Plaintiff says that on the night in question, when he attempted to enter said building, the hallway of said building was without lights and dark; that the elevator was not at the ground floor of the shaft, and that the doorway of the said elevator shaft at the ground floor was open, and the pit beneath said elevator was about eight or ten feet deep.

"Plaintiff states that on the evening he was hurt, and for a long time prior thereto, the lock upon the door, which, on the ground floor, separated the hallway from the elevator shaft, was broken and of no use; that this being so, tenants and those other than tenants could and did operate said electric elevator at any time in the evening, all of which defendant knew or by the exercise of ordinary care could and should have known; that defendant negligently failed to repair the aforesaid lock and had for a long time and at the time of plaintiff's injuries negligently allowed said lock of said door to be and remain in such defective condition that when the aforesaid door was pushed closed it would rebound and remain open, and negligently failed to take ordinary care to prevent in the evening the operation of said elevator by tenants and others and negligently failed to keep said elevator in the evenings and particularly the evening in question at the ground floor, and negligently failed to light the aforesaid hallway. Plaintiff states that it was the duty of defendant to keep the hallway of said building lighted in the evening, to keep the aforesaid lock of the aforesaid door in good condition, to lock the aforesaid door and to keep it closed and to prevent tenants and others from operating said elevator and to turn off in the evening the electric current from said elevator and to keep the aforesaid elevator at the ground floor, all of which defendant on the occasion of plaintiff's injury negligently failed to do, and which acts of negligence (stated in this paragraph) on the part of defendant, its agents and servants, directly caused plaintiff's injuries as hereinafter stated.

"Plaintiff states that in attempting to enter said building, not knowing that said elevator was not in operation, and not knowing the door thereof was open, he attempted to find his way to said stairway, and on account of the darkness was unable to see that said elevator door was open, and in attempting to make his journey to said stairway, he walked up to the front of said elevator, and the door

being open, he fell into said pit and was thrown a great distance down to the floor of said pit and greatly and permanently injured."

The answer of defendant is a general denial and, by way of further defense, "defendant states that whatever injury, if any, plaintiff sustained on the occasion mentioned in his said amended petition was due to and caused by his own negligence and carelessness, directly contributing thereto in this, that plaintiff, without using and exercising ordinary care for his own safety, entered said building in the nighttime, and when it was dark therein, and walked about in said building then and there in the nighttime and when no light, or lights, were burning in said building and when it was dark in said building, and in the nighttime; that plaintiff, upon coming to and against the door of the elevator shaft in said building, and while it was dark and in the nighttime, as aforesaid, and when he could not see where or into what place said door permitted entrance, opened the said door and entered into and through the same and thereby was caused to fall into and down said elevator shaft."

The reply is a general denial.

At the beginning of the trial, defendant, through its counsel, made the following admission, which is incorporated in the record:

"No question but what the Salveter & Stewart Investment Company owned the building; he need not offer any proof on that. We admit it. I will make this admission: The record may show that to each tenant we signed up directly with, we gave a key to their part of the building, whatever floor it happens to be, and likewise a key to the outer door of 507 North Broadway. That had taken place prior to April, 1922; we did not give any key, and this admission must not go to the extent that we gave a key to Liggett & Myers Tobacco Company, because they were not our tenants. Likewise, the record may show that there were no lights burning in the hall; that it was extremely dark in the hall at the time described, and as will be shown by the evidence in the case."

Plaintiff was injured about 6:45 o'clock on the evening of April 10, 1922. He was a salesman employed by the Liggett & Myers Tobacco Company, which company occupied and maintained an office on the second floor of said Stewart Building under a subtenancy, or rental arrangement, with Smith-Daniels Clothing Company, tenants of defendant, which latter company occupied the remainder, or front part, of the second floor of said building. The fourth floor of the building was rented and used by the Burroughs Adding Machine Company, and other floors were rented and occupied by various tenants of defendant. For approximately three months prior to plaintiff's injury, the Burroughs Adding Machine Company had maintained a salesmanship school on the fourth floor of the building on three nights of each week, and the evidence tends to show that the

employees of said company, on said nights, used the elevator in ques- tion "right along during all the time we had the school, three nights a week." Likewise, the employees of the Liggett & Myers Tobacco Company, on Monday evening of each week, for six or seven months prior to plaintiff's injury, had used its office on the second floor of the building for a salesmanship school. Plaintiff testified that he had attended these salesmanship meetings, or school, but, prior to the night of his injury, he had never entered the building alone after the lights in the first or ground floor hallway had been extinguished. The evidence tends to show that defendant employed a negro woman to operate the elevator between the hours of 7:30 o'clock in the morning and six o'clock in the evening. That the elevator operator, defend- ant's employee, doubtless had knowledge of the use of the elevator by tenants of the building and their employees, at night, and after the hours of the elevator operator's period of employment, is strongly indicated by the following testimony of one of the employees of the Burroughs Adding Machine Company, elicited on cross-examination by defendant: "Well, when we went in there that evening, or any evening we went in there, generally, sometimes the elevator operator used to surrender the elevator right to us; she would walk out, take her hat and coat, and we would take the elevator and go right up- stairs."

The lights in the first floor hallway were turned off by a light key, furnished by defendant to a tenant on the first floor and who was the owner of a cigar stand located in the building, who testified that he "closed up about 6:30 and turned off the lights under instructions from the owner (defendant) every evening."

Defendant's office building is situate at the northwest corner of Broadway and St. Charles Street. The ground floor hallway, lead- ing to the building, opens on the west side of Broadway, some distance north of St. Charles Street. The entrance hallway extends east and west, and has two sets of double doors, the first set being four feet six inches from, and west of, the Broadway entrance. Immediately upon entering the first set of double doors, there is encountered a cigar stand on the left, or south side, of the hallway, and on the right, or north side, a gum or peanut vending machine upon a pedestal adjacent or chained to the wall. Immediately west of the vending machine is a steam radiator located on the right or north side of the hallway. Pass- ing these, one encounters a second set of double doors, similar to the first set, but located some distance west of the first set of doors, and nearer the stairway and elevator. Passing through the second set of double doors, one enters the inner hallway, on the north or right side of which stands another steam radiator, and on the left or south side, adjacent to the west end or wall of the hallway, is a stairway or flight of steps leading to the second floor of the building. At the extreme

west end of the hallway is the elevator shaft, with a doorway leading to the elevator, which is adjacent to the right or north side of the hallway, and which extends between the first step of the stairway and the right or north wall of the hallway, which hallway the evidence tends

to show was commonly used by the tenants of the building and their employees. The inner hallway is approximately five feet wide from north to south. A flashlight photograph of the inner hallway, and the relative locations of the steam radiator, the elevator doorway, and the stairway, discloses, much better than words may describe, the

*locus in quo.* We therefore incorporate herein and annex hereto, on the preceding page, as a part of this opinion, the photograph, identified in evidence as plaintiff's exhibit A.

The evidence further tends to show that the south or left door of the inner set of doors was kept securely bolted after the lights in the hallway were extinguished in the evening, and plaintiff testified that the left door of the inner set of double doors was thus securely bolted on the night of his injury. Each tenant of the building was furnished by defendant with a key by which to gain entrance to the first floor hallway when the outer entrance doors leading from Broadway thereto were locked, as they usually were in the evening after 6:30 o'clock. Prior to the night of plaintiff's injury, one Tevis, an employee of the Liggett & Myers Tobacco Company, had the possession of the key and unlocked the door for the admission of the Tobacco Company's employees, including plaintiff. On the night in question, however, Tevis was absent from the city and had delivered the key to plaintiff for the purpose of unlocking the outer entrance doors. Plaintiff left the building about six o'clock in the evening, before the hallway lights had been extinguished, and went to a nearby restaurant for dinner, returning to the building about 6:45 o'clock. It was raining, and the unlighted entrance and hallway were extremely dark. Respecting what he did after returning to the building, plaintiff testified: "Q. When you came to the eastern set of doors, which have been described here, what did you do? A. I unlocked the south door. Q. Did you pass through it? A. Yes, sir. Q. Now tell us, when you passed through it, what did you do? A. I went to the second set of doors. Q. The second set of doors, were they locked? A. No, sir. Q. Which of those two doors did you pass through? A. The one on the north wall, right side. Q. How did you happen to pass through the one on the north wall? A. It was open; that is, it was not bolted. Q. Was the other one bolted? A. Yes, sir. Q. When you had passed through the one on the north, the north of the two doors, how did you proceed west, did you proceed west—just tell in your own way, now? A. I groped along; opened the doors; here was the radiator; it has a valve sticking out; I put my hand on that, and groped along that way until I got to the end of it. I came in and had my hand on the radiator to my right; groped along that, put my hand up, and walked forward, to touch the elevator door. I walked forward with my hand up to touch the elevator door. Q. Then to proceed in what direction? A. To my left, to go up the steps. When I came to this elevator door, or the space where the door should be, closed, the door was not there, and I stepped—pitched into the hallway; lost my balance. If the door had been there, I would have stopped; as it was, the door being open, I went right on down. Q. Was there any light in that shaft of any

kind or sort? A. No, sir." Cross-examination: "On the night in question I had a key to the building; it was an extremely dark night; apparently the entire building was in darkness; I could see that there was no light in the place; I took my key and opened the door and went in; it was so dark that I could not see my hand if I held it up in front of my face; I groped along slowly toward the elevator with my hand raised up; referring to plaintiff's exhibit A, it shows an iron balustrade on the stairway; the height of this post at the bottom is approximately about as high as my head; that is the reason I say you cannot feel that balustrade there; drawing a line from the top of the post back, it comes about even with the sixth or seventh step; the entrance to the stairs here at the bottom is five feet; the bottom step is longer; it is about six and one-half feet; about twelve feet from the wall, if you raised your hand you could feel the balustrade; it was not my intention to use the elevator; it was my intention to go up those steps; . . . on the night in question I had a key to the outside door which I got from Mr. Tevis; I knew that after 6:30 o'clock the elevator closes and the elevator operator is not there; I knew that the lights are turned out; I knew that when the cigar man is not there the lights are turned out; I knew this when I started back at 6:45 P. M.; I might have locked the door after I passed through it, I am not positive one way or the other; I do not know where Liggett & Myers got the key; I opened the north door; the south door was bolted at the bottom and top; the left door was bolted; the doors are four and one-half feet wide; I could have taken a step south and gotten hold of the stairs on my left, but that was the most inconvenient way to do it; I was afraid of falling over the step that was projecting out; I could have reached the banister after walking a little distance; I don't think I could have done that in one step. . . . Q. You realized all the time that you were in there, moving forward, with your hand in front of you, as you testified to, that it was absolutely dark, that you could not see your hand a few inches in front of your face? A. Yes. Q. You realized that? A. Oh, yes. Q. Notwithstanding, realizing that—you likewise knew there was an elevator shaft there, too, didn't you? A. Yes, sir. Q. Notwithstanding that, you went on through that darkness without lighting a light; is that not true? A. Yes, sir. Q. And went on until you fell? A. Yes, sir. . . . I had no matches in my pocket that night; I realized this when I was at Weeghman's restaurant; I don't know whether if I had had one I would have lit it or not; had I asked for a box of matches at Weeghman's they would have given me one; while at Weeghman's I didn't realize that I was going to a dark hallway; as soon as I got to the door of the hallway I realized I was going into darkness; I knew this at Weeghman's but

didn't ask for matches; this was the very first time I had come back alone, that I had got there after dark.''

The testimony of several witnesses for plaintiff was to the effect that, for several weeks prior to the date of plaintiff's injury, the locks or catches on the first floor elevator door were broken or defective; that the door often rebounded, when attempting to close it; and that the elevator door was frequently found open or partially open. Several witnesses described the proclivity of the door to rebound. For brevity, we quote their composite testimony, thus: ''The door sometimes was open; I could not say exactly how much, but I have seen the door open; I have seen it that way several times. . . . Defective; would not lock; the door would not shut. I mean when you slammed the door, it would not catch; it would bounce back. I have seen it bounce back half way open. When it was pulled too rapidly, it would slam back. I seen it a dozen times. Halfway open, if you hit it any distance at all, slammed it hard. The race running across the bottom of the floor, there is a tooth broke out. It never caught. . . . I knew it was defective. I have seen the door standing ajar; at different spaces at different times; maybe six inches to three feet, I guess. I have seen it standing open, and pushed it closed, and it would rebound back, and you would have to push it closed, just enough to make it stay there; when you would go to push it too hard it would rebound back. . . . I saw the elevator door standing open anywhere from two inches on up to—sometimes I have seen it three feet or so. . . . The lock was always faulty before that (April 10, 1922); all you had to do was walk in there and push the door open, and run the elevator up. Generally always rebounded; I have rode in it already when we started up with the elevator, the operator had to go back down and close it; she would slam it over, and naturally it would not catch; it would rebound open; that is, according to how hard she would throw it. . . . It would rebound, if it were closed hard, repeatedly, from one inch to two feet. . . . In coming in the building I had noticed quite a few times the door would rebound; when the girl would close it, it would rebounce back; it would be sometimes two or three inches, sometimes as high as two feet, sometimes possibly a little more. I had noticed it one time in particular; I stopped and closed it when the door was open quite a bit. . . . I have seen the door open any number of times. The door would rebound about a foot, foot and a half.'' Plaintiff testified: ''On one occasion, six months previous to the time I was hurt, I noticed that the elevator door would not stay closed. I noticed that it bounced back two or three feet when shoved closed. I never paid any attention to it after that particular incident, about six months before I was hurt. I did not ride on the elevator. My office was on the second floor.''

The dimensions of the elevator door were three feet ten inches wide by seven feet four inches high, and the door consisted of No. 16 gauge sheet metal, one-sixteenth of an inch thick, reinforced by one-inch angle iron frames, and weighed in all 138½ pounds. It was equipped with ball-bearing rollers which ran over, or upon, a flat metal track at the top of the elevator door.

It was developed, on cross-examination of certain of plaintiff's witnesses, that, shortly after six o'clock on the evening in question, several employees of the Burroughs Adding Machine Company entered the elevator from the hallway on the ground floor of defendant's building and ran the elevator to the fourth floor of the building, on which floor were the offices of the Burroughs Company, and left it there until after plaintiff fell into the elevator shaft and was injured thereby. Several employees of the Burroughs Company testified, on cross-examination, that they were positive they had securely closed the elevator door on the ground floor of the building before starting up to the fourth floor in the elevator, and that they were the last persons who had handled the elevator prior to plaintiff's injury.

At the close of plaintiff's evidence, the trial court gave and read to the jury a peremptory instruction in the nature of a demurrer to the evidence, directing the jury to return a verdict in favor of defendant. Thereupon plaintiff took an involuntary nonsuit with leave to move to set the same aside, whereupon a judgment was entered of record dismissing plaintiff's cause of action and taxing the costs of suit against plaintiff and awarding defendant execution therefor. In due time plaintiff filed a motion to set aside the involuntary nonsuit taken, which motion was overruled by the trial court, and plaintiff was granted an appeal to this court from the judgment entered *nisi.*

I. There is but one question presented on this appeal, namely, whether the trial court erred in giving and reading to the jury defendant's peremptory instruction in the nature of a demurrer to plaintiff's evidence, thereby forcing plaintiff to take an involuntary nonsuit and to suffer judgment to go against him. Defendant (respondent) urges that the trial court's action was right in view of the evidence presented by plaintiff. It is insisted by defendant that it was not established or shown by plaintiff's evidence that defendant owed plaintiff, or his employer, the Liggett & Myers Tobacco Company, any duty to keep the ground floor hallway lighted after 6:30 o'clock in the evening, after which time in the evening plaintiff entered the hallway with the intention (so he testified) of ascending the stairway leading therefrom to the second floor of the building on which was located the Tobacco Company's office; and that, absent such duty on its part, de-

*Margin note:* Hallway Lighted: Duty.

fendant was not negligent in falling to light the ground floor hallway.

The evidence of plaintiff is indisputable that the defendant's building was used and operated at the time of plaintiff's injury as a *semi-public* office, or business, building, and that the several floors thereof were rented by defendant to a number of individual tenants. It also appears that the Tobacco Company, plaintiff's employer, occupied and used a portion of the second floor of defendant's building, perhaps not as a direct tenant of defendant, but as a subtenant of the Smith-Daniel Clothing Company, which was then a tenant of defendant. While the terms of the rental arrangements, or leases, had between defendant and its several tenants of the building, are not shown by the evidence, yet it does appear from the evidence that the ground floor hallway was commonly used by the occupants of the building and their employees as the entrance way to both the stairway and the elevator. In fact, it does not appear from the evidence that entrance could be gained to either the stairway or the elevator except by means of the single hallway leading from Broadway. It further appears that defendant locked the outer set of double doors leading into the hallway about 6:30 o'clock on each evening, but that defendant also furnished each tenant, or occupant of the building, with a key whereby to gain admittance and entrance to the ground floor hallway after the entrance doors were locked. This action of defendant, in and of itself, in our opinion, amounted to an implied, if not an express, invitation by defendant to the occupants of its building, and their employees, to enter the building by way of the ground floor hallway for the purpose of using the stairway, and perhaps the elevator, or both, after the hallway lights had been extinguished for the night and the outer doors had been locked. It also appears from the evidence that the lights within the ground floor hallway, or entrance to the building, were controlled by a key, which was entrusted by defendant to its tenant, the cigar merchant upon the ground floor of the building, who testified that he turned off the lights by means of the key furnished to him by defendant, under instructions of defendant, every evening about 6:30 o'clock. No other occupant of the building appears to have been furnished with a key controlling the lights in the hallway, which indicates, to our minds, the intention of defendant to retain the control of the entrance hallway and the lighting thereof. It therefore appears from the evidence before us that, while occupants of the building and their employees were permitted, if not actually invited, by defendant to use the hallway at night and after dark, nevertheless no occupant or tenant of the building was granted exclusive and absolute control of the ground floor hallway, the stairway leading therefrom, or the ele-

**Invitee.**

vator, but defendant, on the other hand, at all times retained the full and complete, or at least the partial, control thereof.

In 9 Ruling Case Law, pages 1250-1252, the established rule respecting the liability of the owner of an elevator, and of the entrance or approaches leading thereto, is thus stated:. "Where the owner of a building leases different floors or rooms to different tenants, but retains the control and management of an elevator in the building, he is responsible for injuries to tenants, their employees, and such other persons as may lawfully use the elevator. . . . It follows that one who lets a hotel with an insufficiently lighted passenger elevator which .creeps when not in use, because of defective machinery, is liable for injury to a guest who, in attempting to use the elevator, fell into the well because the car had moved from the place where it was left. . . . The landlord's duty extends to members of the tenant's family, guests, employees, and other persons passing to the apartments of the tenant by actual or implied invitation. The neglect of the owner to guard the elevator well in the absence of the carriage, and his failure to light the approach to the opening, may justify the jury in finding the owner guilty of negligence."

The foregoing statement of the established rule respecting the liability of the owner of a building for injuries sustained by an invitee due to negligence in the lighting of the approaches to the elevator and its operation, finds ample support in the reported juristic decisions. In Lander v. Hornbeck (Okla.), 179 Pac. 23, defendant was the owner of a five-story building which was used and occupied by various tenants, the fifth or top floor being leased by the defendant to one Mrs. Summers. All of the tenants used a common stairway, extending to the top floor, and also an elevator, which was under control of the defendant landlord and was operated by him from early morning to approximately six o'clock in the evening of each day of the week, except on Sundays, and the operator employed by the landlord generally took the elevator to the fifth floor in the evening when his hours of employment were done and left the same for the permissive use of Mrs. Summers for the rest of the day. The power for the operation of the elevator was furnished by defendant, but Mrs. Summers employed an elevator operator, who went on duty about eight o'clock in the evening and remained on duty until midnight, when needed. The doors to the entrance of the elevator did not automatically lock, and when locked could be easily unlocked from the outside. The elevator was as accessible to the use of other tenants as to Mrs. Summers after defendant's operator had ceased his work, and the evidence tended to establish that little attention was paid to the elevator and its operation by any one after defendant's day operator left it, but that it was operated by any one who desired to use it. On a Sunday evening, plaintiff, with others, was a guest of Mrs. Sum-

317 Mo. Sup.—74.

mers, and after visiting her apartment left the apartment, and started through a poorly lighted hallway to the elevator, and, when reaching the elevator shaft, the door of which was open, plaintiff stepped into the shaft and fell to the first floor of the building and was seriously injured. Said that court, in ruling defendant's liability for damages: ''Applying the rule best supported by the authorities, we must hold that in cases of this character, where negligence is shown to exist that is the proximate cause of the injury, the landlord may be held liable unless the elevator is in the absolute control of the tenant. Was this elevator on the day of the injury in the absolute control of the tenant within the purview of the authorities above cited? . . . The permissive use by the tenant cannot mean absolute control. The landlord or any of the tenants might have used the same at any time that day, and not have violated any right of hers (Mrs. Summers'), and in fact under this evidence she might have been deprived of its use entirely, and she would have had no just complaint. Viewing the situation, it would be folly to assert that the agent of the landlord did not know the elevator was being used by the tenant in her business, for all the evidence is to the contrary, and the entire record bristles with passive negligence in the operation and management of this elevator. The permissive use of the elevator to any who desired was negligence.''

In Gordon v. Cummings, 152 Mass. 514, plaintiff sought to recover damages for injuries sustained by him in falling into an unguarded elevator well in defendant's business building. The trial court withdrew the case from the consideration of the jury, and the appellate court, in ruling that the case should have been submitted upon the evidence, said: ''The plaintiff was a United States letter carrier; the place which he sought to enter was known as number 619 Albany Street. It was always open, having no door to close it. Ascending from its threshold, which itself constituted the first step, was a flight of four or five steps to a door which opened upon an entry or hallway in which were three or four boxes, placed there for the accommodation of the plaintiff by the tenants of the defendants, who occupied the various stories of the building, for the reception of their mail matter. . . . Plaintiff had a letter which he was seeking to deliver by placing it in the box. The hallway into which the plaintiff sought to enter had a flight of stairs which led to the next story. The defendants owned the building, and there was nothing which tended to show that this hallway was leased, or that they did not have the entire management of it. . . . While the building was intended for workshops, and while there were no offices in it, it was still one where, to some extent at least, the tenants received letters, and there was a preparation and adaption of the entry, or hallway, for the plaintiff's use which might well lead him to be-

lieve that he could safely enter in the performance of his duty. [Citing cases.] If the plaintiff was authorized and induced to enter this hallway, there was also evidence of a want of due care in the management of the elevator well down which the plaintiff fell. It opened directly upon the street, about twenty inches back from the line of the street, by a doorway framed in granite, its threshold being some eight inches higher than the flagging of the street. Separated from this elevator doorway by a stone post one foot wide was the entrance, of about the same dimensions and construction, which led up to the hallway of which we have already spoken. Its threshold was at the same height as that of the elevator entrance, and was a continuation of it, but not quite so wide. The elevator entrance was provided with an up-and-down sliding door, which when down closed the entrance, and with a chain, which when hooked hung loosely across it. On the evening when the accident occurred the elevator doorway was open and the chain unhooked. It was quite dark, about half past six o'clock, in January, and the night was foggy. There was no light on the outside of the building, although there was a gas light at a distance of about sixty feet, and an electric light at a distance of a hundred and twenty feet. . . . Upon this state of facts, there was evidence of a want of due care in leaving the elevator entrance thus exposed, and the plaintiff's testimony tended to show that, while seeking to enter at number 619, he stepped into the elevator entrance and was precipitated down the well. He had a right to suppose that, when seeking to enter where he had a right to go, he would not be exposed to this danger, and that an entrance by its side, easily to be mistaken for it, would not be left open and unenclosed by any barrier at a time when it was not in use. Without any light directly upon it, with the door open directly upon the elevator well, with the chain unhooked, it might certainly be held by a jury that there was a carelessness in its management which would expose any one to serious danger who was lawfully approaching the entrance to the hallway. There was also evidence that for this condition of things the defendants were responsible. While their tenants had the authority to use this elevator, it was the defendants' duty to see that, while not in use, it was in a safe condition for those who were passing in the street or lawfully seeking access to their building. They furnished the power by which the elevator was run, although the tenants used it for freight purposes during the day. . . . While the defendants permitted their tenants to use the elevator during the day, they had not let it to them nor relinquished to them the control of it. They had not let the whole of their building, but were themselves in occupancy of the part that was not let, and, so far as it appears, had full authority to make the well safe.''

In Burner v. Higman & Skinner Company, 127 Iowa, 580, 103 N. W. 802, the co-defendants were respectively the owners of a four-story business building and their tenants of the several floors thereof. Adjoining the east end of the building was a freight elevator, and on the ground floor there was a covered loading platform with an opening into the elevator shaft, made for the purpose of getting goods from the covered loading platform onto the elevator. To this opening there was a door, with rollers attached to the top, which ran on a horizontal track over and beyond the opening. This door, when closed, protected the elevator shaft and well, and when open, left it in an exposed condition. Plaintiff, a drayman, went to the building to remove some goods stored therein. He drove to the loading platform preparatory to loading the goods onto his wagon. The door to the elevator shaft was open. The covered shed or platform was dark and the door to the elevator was pushed back and the elevator had been raised above the first floor. Plaintiff walked into the shaft through the open and unguarded doorway and fell to the bottom of the shaft, receiving injuries for which he sought to recover damages. In holding the defendant owners of the building liable for plaintiff's injury, the court said: "It will be observed that the accident did not happen by reason of any use of the elevator proper. The negligence charged is primarily the location and construction of the elevator well or shaft, without guards or gates, in such a place as that it could not be seen, knowing that persons must frequent the place and use the elevator in order to make the premises available to the lessees. The evidence, we think, shows such retention of control over the elevator by the landlord as that he was charged with the duty of keeping it in such condition—a reasonably safe condition—as to protect persons rightfully upon the premises from injury. The elevator was not leased outright to any of the tenants. They simply had the right to use it in common. This, as we think, shows that there was such a reservation of control on the part of the landlords as that they owed a duty to any one who might rightfully be in proximity thereto. As this was a freight elevator, they were not bound to the highest degree of care, but were required to use ordinary and reasonable care in protecting and lighting this elevator well or shaft, so that persons rightfully upon the premises might not be injured thereby. . . . The elevator was for the common use of all of the tenants. None of them had the exclusive control thereof. In such cases it is generally held that a landlord is liable with the particular tenant extending the invitation, on the theory that it is the duty of the landlord to keep the property so used in a reasonably safe condition. [Citing authorities.]"

In addition to the absence of lights in the hallway of defendant's building at the time of plaintiff's injury, the evidence of plaintiff

further tends to show that the catches or locks upon the elevator door on the ground floor of defendant's building had been broken and defective for some considerable time prior to plaintiff's injury, and that the elevator door, when sharply pushed in order to close it, frequently rebounded, thereby leaving the doorway or entrance to the elevator shaft unguarded and open from several inches to three feet, or more. That such defective condition of the elevator door existed, if it did exist, a sufficient length of time prior to plaintiff's injury to acquaint, or give notice to, defendant of its condition cannot well be gainsaid under the plaintiff's proof herein. Failure on defendant's part to remedy the defective condition of the elevator door constituted negligence, by the weight of judicial authority.

In 9 Ruling Case Law, pages 1237-1239, it is said: "If an innocent person suffers injuries by reason of some defect in the mechanism, in the absence of contributory negligence or some other defense, the owner is generally liable for the injuries, unless the defect or default was latent and could not have been discovered by a careful examination according to the best tests reasonably practicable. . . . The obligation of care and foresight rests on the person who maintains the elevator, and he cannot shift it from himself to another. . . . The openings in the well should be guarded by doors so adjusted that they cannot be easily opened from the outside; and where a person, without being guilty of contributory negligence, passes or falls through an opening in the shaft, the negligence of the proprietor of the elevator is a question for the jury. Especially is the owner negligent when the unguarded shaft is located in a dark corner or other place where the danger therefrom is not readily observable. . . . Not only is a high degree of care required in the original construction of an elevator, but the owner must exercise an equivalent degree of care to make all necessary repairs, and for this purpose he must make such inspection of the elevator and of the appliances connected therewith as is reasonably necessary to discover such defects as may exist. He has no right to assume that an elevator continues in a safe condition because there are no obvious defects and because it has been used with safety for years. . . . The owner of the elevator must account for the results of all defects which he might have discovered by due inspection and investigation, but which he failed to discover and repair."

The principle is thus aptly stated in Colorado Mortgage & Investment Co. v. Rees, 42 Pac. l. c. 43: "A person has the right to assume that the owner and operator of an elevator will exercise that high degree of care that the nature of the business demands, and will see to it that the approaches thereto are reasonably safe, and that the doors to the shaft can be safely and securely locked, and are not

negligently left open; and that he may safely enter when he finds the door open, without stopping to make a special examination. [Tousey v. Roberts, 114 N. Y. 312, 21 N. E. 399.]"

The respondent furthermore urges that the evidence herein fails to show any negligence on the part of defendant proximately causing injury to plaintiff, but that, on the contrary, assuming it to be true that the elevator door was open when plaintiff fell into the elevator shaft, nevertheless plaintiff's evidence tended to show that, about 6:30 o'clock in the evening of the plaintiff's injury, several employees of the Burroughs Adding Machine Company passed through the ground floor hallway, opened the elevator door and entered the elevator, closing the elevator door securely after entering the elevator, and then ran the elevator to the fourth floor of the building and kept it there until after plaintiff was injured, and that no one else is shown to have opened or handled the elevator door. Hence, it is claimed by respondent that the situation and dangerous condition which plaintiff encountered in passing through the unlighted hallway was caused by a third person or persons, for whose negligent conduct, if any there be, defendant is not legally answerable. The evidence of plaintiff, however, goes farther and tends to show the permissive use of the elevator by the Burroughs Company's employees, or at least such use of the elevator without protest or objection from defendant, and that such employees of the Burroughs Company on prior occasions had entered the elevator and operated it themselves upon the surrender to them of the elevator by defendant's own operator at the time when her daily hours of service expired. Such evidence tended to show knowledge on the part of defendant, through its agent and representative, the operator of the elevator, that other persons than defendant did operate the elevator, from which evidence a jury may reasonably have drawn the inference, we think, that the defendant acquiesced in the use and operation of the elevator, after the elevator operator had completed her day's service, by the several tenants of the building and their employees. Likewise, we think that a jury well might have believed that the employees of the Burroughs Company were mistaken in testifying that they had securely closed the elevator door after entering the elevator, and might have properly drawn the inference that the elevator door had been hastily or violently thrown with such force as to rebound and remain open, as had occurred (according to the evidence) on numerous occasions prior to plaintiff's injury.

The rule, as to when the cause of injury is proximate, is thus clearly stated in 29 Cyc. 491: "It is sufficient if it be the efficient cause which set in motion the chain of circumstances leading up to the injury, and which in natural, continuous sequence, unbroken by any

*Proximate Cause: Act of Third Party.*

new and independent cause, produced the injury. The primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the one so operating on the others as to make the injury the result of the primary cause.''

In Colorado Mortgage & Investment Co. v. Rees, 42 Pac. 43, a case quite similar in its circumstances to the case at bar, plaintiff fell down an unguarded elevator shaft in defendant's office building. Said that court, in ruling defendant's liability for plaintiff's injury: ''The testimony introduced on the part of plaintiff was to the effect that the lock on the elevator door fastened with a spring catch, and when locked, if the spring was not broken, no one could open the door from the outside; that, at the time of the injuries complained of, and for a long time anterior thereto, this spring was broken, and by reason of such defect the catch would unlatch by the rebound of the door when shut with any force, and, when closed, a push from the outside, and even the weight of the door itself, would raise the latch; that, at the time mentioned, the elevator was in the upper part of the shaft, and the door wide open; and that, by reason of the insufficient light, plaintiff did not discover the absence of the elevator, stepped into the shaft, and was injured. . . . Counsel for appellant contend that . . . they had the right, under the evidence introduced, to have the question of the interference of a third party submitted to the jury; and that, if the jury should have found that the door was opened by Thorne, such act would constitute an efficient intervening cause, that would relieve defendant from liability, although it had been negligent in maintaining suitable fastenings as alleged. . . . It was the duty of defendant, in operating the elevator in question, to exercise the utmost care and diligence, and to provide and maintain proper and secure fastenings to the doors opening into the elevator way that could not be opened or controlled from the outside. Therefore, the (trial) court was correct in saying that it was 'wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastenings to its elevator door,' for, had it performed its duty in the premises, such interference by a third party would have been impossible; hence, its negligence necessarily concurred in, and constituted an essential factor in, causing the injury. It is well settled by the adjudged cases that, where an injury is the result of the combined negligence of the defendant and the negligent or wrongful act of a third person, for whose act neither the plaintiff nor the defendant is responsible, the defendant is liable, when the injury would not have happened except for his negligence. The law applicable to such a state of facts is thus stated in Shearman and Redfield on Negligence

(Sec. 10): 'Negligence may, however, be the proximate cause of an injury of which it is not the sole or immediate cause. If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for such negligence, the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time.' "

We are of the opinion that plaintiff, under the evidence herein, was entitled to a submission of his case to the jury on the issues whether the defendant was negligent in the lighting, maintenance and operation of its hallway and elevator, and whether such negligence was the proximate cause of plaintiff's injury.

II.   But respondent claims that the peremptory instruction was rightly given by the trial court for the reason that plaintiff's evidence, including his own testimony, convicts him of contributory negligence as a matter of law. It is argued that plaintiff

**Contributory Negligence.**   knew the general conditions obtaining in the defendant's building and the ground floor hallway thereof; that he knew that defendant discontinued the elevator service at six o'clock and extinguished the lights in the ground floor hallway at 6:30 o'clock on each evening; that he must have been aware of the fact that, if he proceeded to the west along the right, or north, wall of the hallway, he would walk directly to the elevator door and into the shaft if the door was open and the elevator not there; and that he realized at the time that it was so dark that he could not see his hand before his face, and yet, without procuring a light of any sort, he voluntarily accepted the situation and carelessly relied upon the elevator door being closed.

While it is true that plaintiff testified that he was generally familiar with the entrance hallway of the building, yet he testified that he had never before entered the hallway alone after dark. It is also true that he testified that he knew the lights in the hallway were extinguished about 6:30 o'clock in the evening, and that, upon reaching the hallway, he realized that he was in absolute darkness and yet he proceeded without lighting any light, but he also testified that he did not have any matches with which to strike a light. While he doubtless might have procured matches or a light by returning to the restaurant from whence he had come, yet we are unwilling to say that his failure to retrace his steps and return to the restaurant for matches or other means of light conclusively convicts him of contributory negligence as a matter of law. While he further testified that he noticed that the elevator door would not stay closed and that "it bounded back two or three feet when shoved closed," yet he also tes-

tified that such observation was had some six months prior to his injury and that he did not ride in the elevator. The observation by him of the defect in the elevator door was so long before his injury that plaintiff well might have forgotten the incident and have given it no thought on the night of his injury, or well might have concluded that the defect in the elevator door had long since been discovered by defendant and remedied.

Shearman and Redfield on the Law of Negligence (6 Ed.) sec. 719, say: ''Trap-doors, hoistways, elevator shafts, and similar openings in floors, unless far removed from those parts of the building which are lawfully used by persons not having actual notice of their existence, should be protected so that no one exercising ordinary prudence could fall through them; although his knowledge of the premises and of his proximity to an elevator shaft is not conclusive that he was not exercising due care when he fell into it in the dark.''

In Gordon v. Cummings, supra, 152 Mass. l. c. 517, it is said: ''There remains the question whether the plaintiff offered any sufficient evidence of due care. He knew the character and description of the premises; he had passed them many times, and was aware that the two entrances were close to each other; but his previous knowledge of their dangerous proximity is not conclusive that he was not exercising due care in attempting to enter. [Looney v. McLean, 129 Mass. 33.] He described the care with which he moved, his feeling his way, his effort to ascertain when he stepped upon the threshold that he was in the right entrance. To some extent he might suppose that at that hour either the chain would be across or the door closed at the elevator entrance, and putting his knee and hand forward discovered neither. The character of his conduct, depending upon this and other circumstances, is such that it is not possible to say, as matter of law, that, viewed in the light of common knowledge or experience, he was lacking in due care. [Wheelock v. Boston & Albany Railroad, 105 Mass. 203.]''

In People's Bank v. Morgolofski, 75 Md. 432, 32 Am. St. 409, wherein plaintiff, an employee of one of the tenants of defendant's business building, fell into an open elevator shaft, that court said in ruling the question of plaintiff's contributory negligence: ''The act relied on here to show contributory negligence on the part of the plaintiff is the one established by his own testimony, namely, that he walked into the elevator shaft without looking to see if the elevator was there. He testified that he could not see at all, but that he was sure with the door open and the bar back, the elevator was in its place; and that it was so dark he could not see whether it was there or not. . . . And so we are of opinion that the court below properly left it to the jury to find whether, under all the circumstances of this case, the plaintiff had a right to assume that the elevator was

at the fourth floor where he stepped into the shaft. . . . It was undoubtedly the duty of the defendant to operate the elevator in question with reasonable care and vigilance (Engel v. Smith, 82 Mich. 1; Shearman & Redfield on Negligence, section 719); and the plaintiff had a right to assume that this duty would be faithfully performed. So assuming, he would not be required to exercise that degree of caution which would properly and fairly be demanded of him under other circumstances. It is a sound rule of law, says Mr. Beach in his work on Contributory Negligence, page 41, that it is not contributory negligence not to look for danger when there is no reason to apprehend any.''

Our own court, en Banc, has given expression to a similar thought in Geninazza v. Auction & Storage Co., 252 S. W. 419, wherein plaintiff, a customer of defendant, was injured by falling down a dark stairway in defendant's business building. We there said: ''It was a gloomy afternoon. There was substantial evidence that the platform and steps were so dark that plaintiff did not see where the steps began, although she looked and proceeded slowly and carefully. That there is many a slip between the foot and the step, as well as 'twixt the cup and the lip,' is attested by common experience. . . . If, when she reached the platform, the danger of falling was visible and obvious, her failure to discover and avoid it would amount to contributory negligence. Where, however, the danger is not so obvious that a person should have seen it in the exercise of ordinary care, failure to discover it is not negligence. [29 Cyc. 513.]''

We think that plaintiff's conduct at the time of his injury, under the circumstances in evidence, did not conclusively convict him of contributory negligence, as a matter of law, but that the issue of his contributory negligence was likewise one for the consideration and finding of the jury.

It follows, therefore, that the trial court erred in giving the defendant's peremptory instruction at the close of plaintiff's evidence, and that the judgment *nisi* must be reversed and the cause remanded for trial. It is so ordered. *Lindsay* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.