252 S.W.2d 339 (1952)
BRANDT
v.
THOMPSON.
No. 42827.
Supreme Court of Missouri, Division No. 2.
September 8, 1952.
Rehearing Denied November 10, 1952.
Hullverson & Richardson, St. Louis, for appellant.
J. Porter Henry and Green, Hennings, Henry & Evans, St. Louis, for respondent.
BROADDUS, Special Judge.
This is an action for damages for personal injuries sustained by plaintiff as the result of a fall on a stairway. Plaintiff recovered a judgment of $20,000 against defendant. She remitted $7,500 after a conditional order of the trial court passing upon defendant's motion for a new trial. That motion was then overruled. However, the court sustained defendant's motion for judgment in accordance with its motions for directed verdict and entered judgment for defendant. Plaintiff has appealed.
Plaintiff, Miss Virginia Lee Brandt, was injured on November 22, 1949. She was then 26 years of age. She was employed as *340 an accounting clerk by the American Refrigerator Transit Company, which occupied, as a tenant of defendant, the third floor of the Missouri Pacific Annex Building in St. Louis, Missouri. It had been in the Annex Building 2 or 3 years before this occurrence. There were 13 floors in the Annex, which had a tenant "population" of about 600 persons, 45 or 50 of whom worked for the American Refrigerator Transit Company, on the third floor. Three elevators with a capacity of 10 persons each ran from the top floor to the lobby. There was also an enclosed fireproof stairwell from the 13th floor to the basement, protected at each floor by fire doors. The steps were of a steel frame type with treads made of concrete or composition. The edge of each step was covered with a grooved steel strip about 3 inches wide. These strips had originally been painted with some black, non-slip material which had worn off in the middle of the stairway where people walked, but which still remained in part at the sides near the walls. Plaintiff's evidence, and some of defendant's evidence tended to show that the metal nosing of the treads where plaintiff fell was worn smooth and slick and had been in that condition for a long time. There were no banisters or handrails in the staircase. There was an exit light over the fire door leading from the third floor into the stairwell. After passing through the door at the third floor one is at a landing over which a light is located. When one reached the second floor there was no fire door giving admission into the second floor corridor. The employees of the second floor tenant did not have any use of the elevators or the stairway; they used the exits in the Main Missouri Pacific Building. In other words, one at the second floor landing in the stairwell could not go into the second floor corridor, but would be forced either to return through several turns leading to the third floor or go down the stairway to the lobby.
The record is not clear as to the number of landings and turns in the staircase between the third and second floors. Plaintiff said that there were eight landings between the third floor and the lobby; so that if there were three landings between the second floor and the lobby, as she stated, there would be five turns between the second and third floors.
After reaching the second floor one passes through a wire cage gate which automatically locks as it closes behind one so that it can only be opened from the inside. One is then upon a landing above which another light was located, but it was out on the occasion of plaintiff's injury.
After reaching the landing beyond the wire gate, one turns to the right, descends 8 or 10 steps to a landing where a large window is located, then turns to the left and descends 8 or 9 more steps to a small landing, then turns left at right angles and descends 5 or 6 steps to the lobby. At the time of plaintiff's fall there was no light located at either one of these two landings below the second floor. Down in the lobby there were four 100-watt bulbs in a cluster, located about 12 feet from the last landing. These lights were burning at the time of plaintiff's fall and, by reflection against the wall, cast a dim light up the steps. Some of the witnesses said this light was very poor, but would permit one to detect the shadowy outline of the steps. Others thought that this light was of little, if any, aid in descending the steps.
Plaintiff was injured at about 5:05 p. m., and at that time the large window at the landing between the second floor and the lobby did admit a slight amount of "dusk" according to one or two witnesses, but virtually none according to others.
The elevators carried their peak loads between 4:45 and 5:30 p. m. Since so many people were wanting to leave the building at 5 p. m., the elevators were crowded by the time that they reached the fourth and third floors and did not often stop. As a result, almost all of the 40 or 50 employees on the third floor used the staircase instead of waiting for the elevators. Plaintiff has used the elevators since her injury but found that this has delayed her departure fifteen minutes. Plaintiff, speaking of those employed on the third floor, said that "we would go down the stairs because the elevators are always crowded and they don't stop." The assistant auditor of the American Refrigerator Transit Company for *341 whom plaintiff worked, testified for defendant that he used the steps rather than the elevators. Defendant's building manager, testifying for it, said of the steps: "They are there for use of the tenants if they wish to use them. There is no restriction upon their use."
Every evening during the 2 or 3 years that she worked in the Annex, plaintiff used the stairway to leave the building. On this particular day she quit work around 5 p. m., and walked with a number of others to the stairway on the third floor. She was one of the first to leave and many persons from the third and fourth floors were following her. She was with three men who were separated a step apart behind her. Plaintiff testified that there was a light burning at the third floor inside the stairwell. When she reached the second floor she could see through the wire gate that the light above the landing beyond the gate was out. She said she had not paid much attention before to whether or not there were any lights on either of the other two landings below the second floor. She thought there would be a light at the landing below. She said she did not realize how dark the steps were until she got through the wire gate. When asked why she didn't go back she said that "there were people behind me and would have caused much more congestion and I didn't have any idea how many people were behind me; it was dark, I couldn't see. They were all coming behind me," so she continued. Some of the men with her struck matches or lighters to assist all of them in their descent.
After leaving the landing at the second floor Miss Brandt safely reached the first landing below where the window was located. She then made a turn to her left and then another and started toward the landing near the lobby. She was holding onto the wall and walking on the left side of the steps, but on reaching the second or third step from the top of this flight of steps her foot slipped on the "slick edging of the step," her heel caught, she grabbed for the wall and a railing, which was not there, and fell the balance of the way to the landing, sustaining serious injuries.
As stated, the trial judge set the verdict in plaintiff's favor aside and entered judgment for defendant. Was he justified in doing so? He did this, according to a memorandum filed, because he felt that plaintiff knew of the condition confronting her on the stairway; that when she reached the second floor and before she had gotten through the one-way gate she "had the choice of attempting to descend the stairs or of ascending to the third floor and there taking the elevator to the first floor. To descend the stairs was obviously hazardous; to ascend to the third floor and take the elevator was safe but attended with some slight inconvenience and delay. Plaintiff chose the dangerous way, and under the Court's understanding of the decisions of our Appellate Courts she assumed the risk and is not entitled to recover," citing Dietz v. Magill, Mo.App., 104 S.W.2d 707; Fabel v. Boehmer Realty Co., Mo.App., 227 S.W. 858; and Rogers v. Tegarden Packing Co., 185 Mo.App. 99, 170 S.W. 675. He further said: "The doctrine of assumption of risk (or, rather, incurred risk) is not limited to cases arising out of a contractual relationship. If one voluntarily exposes himself to a known and appreciated danger arising from the negligence of another, he assumes the risk of injury. This is especially so where, as here, there is a safe and a dangerous way of proceeding, and the plaintiff chooses the dangerous way."
It is well settled that the court should never withdraw a question from the jury unless all reasonable men, in the honest exercise of a fair impartial judgment, would draw the same conclusion from the facts which condition the issue. This applies to questions of contributory negligence where the problem is whether reasonable minds might differ as to whether plaintiff's conduct generally conformed to that of a reasonably prudent person.
This court has held that a person may be declared negligent as a matter of law only if a stairway was so "glaringly" dangerous that no reasonably prudent person would use it. Brewer v. Silverstein, Mo.Sup., 64 S.W.2d 289. And that the use of dark stairways is not contributory negligence *342 as a matter of law. McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 298 S.W. 226; Geninazza v. R. U. Leonori Auction & Storage Co., Mo.Sup., 252 S.W. 417; Darlington v. Railway Exchange Bldg., Inc., 353 Mo. 569, 183 S.W.2d 101. In answering the contention that a party who had entered a building after dark and was injured when he departed was guilty of contributory negligence as a matter of law this court, in Duff v. Eichler, 336 Mo. 1164, 82 S.W.2d 881, 884, used this language: "If that be the rule, then it is difficult to conceive how a case of liability could arise where the failure to have proper light would sustain a cause of action. Light is of no use to the blind. Those blessed with vision can perceive the darkness before them. Therefore, if it be negligence per se to attempt to descend a flight of steps in darkness, no one injured by reason of the failure to have light on the stairway could recover against the person whose negligence accounted for the darkness. The case of McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 298 S.W. 226, loc.cit. 235, 236(12), disposes of this question adverse to respondent's contention. See, also Roman v. King, 289, Mo. 641, 233 S.W. 161, 25 A.L.R. 1263; Wilson v. Jones, Mo.App., 182 S.W. 756; Geninazza v. R. U. Leonori Auction & Storage Co., Mo.Sup., 252 S.W. 417".
There were numerous facts and circumstances under which the jury could have concluded that plaintiff acted reasonably in going down the steps toward the lobby. She had used these steps every day for two or three years without mishap. She acted no differently than others on the same occasion and confronted with exactly the same circumstances. That other persons who worked on the third and fourth floors customarily used the steps because the elevators did not stop on those floors is not in dispute. When she started down the stairs from the third floor she did not know the light was out on the second floor. In fact, she did not realize how dark the steps were until she passed through the wire gate. When on the second floor landing and finding the light out there, plaintiff was confronted with this situation. She could not get into the second floor corridor there was no door there. If she elected to go back up the stairs to the third floor she would have (a) more turns of the stairs to traverse, (b) no window to admit light and no lobby lights to reflect light (as in her passage from the second to the first floor), (c) persons to encounter coming down the stairs, rendering her passage "against the stream of traffic" confusing and dangerous to her and to others, and (d) the same slippery stairs to walk upon. Thus her return to the third floor would not, as the trial court said, have been "safe."
These additional facts are to be considered. Plaintiff had little time for deliberation at the second floor. Three of the persons coming along behind her were only a step apart. She and another witness who testified for her said that they expected the steps to become more light as they proceeded. Other persons with plaintiff lighted matches and lighters to assist all of them in descending. Plaintiff proceeded cautiously along the wall where some of the black, non-skid paint which had worn off the center of the steps might still be expected to remain. The steps were solid and there was nothing defective in the plan of their construction insofar as height of risers, width of tread and stability were concerned.
Defendant, citing many cases, insists that the doctrine of volenti non fit injuria applies to the instant case. That maxim means that to which a person assents is not considered in law as an injury. In none of the cases applying the maxim do we find facts like or similar to those found here.
We think that under the evidence, it cannot be said, as did the trial court, that, as a matter of law, plaintiff "assumed the risk and is not entitled to recover."
We do not think that the verdict as reduced by the trial court from $20,000 to $12,500 is still excessive. "The test is whether or not the size of the verdict is such as to shock the conscience of the court." Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69, 75. And this court has been reluctant to order a further reduction *343 after the trial court has passed upon the matter and once substantially reduced the amount. Gieseking v. Litchfield & Madison Ry. Co., 344 Mo. 672, 127 S.W.2d 700. Plaintiff received a permanent injury to her left arm. The medical testimony was that all movements of her left elbow are limited. She has lost one-third of the motion at extension and one-third at flection so that the total loss of motion is 662%3 of her arm. The remaining third of motion is painfully accompanied by grating due to roughness and traumatic arthritis of the elbow joint. Her arm has atrophied. "The strength of her left arm and forearm as a unit has been markedly reduced" and "she has no sustained power in this left arm, and the grip in the left hand has been reduced." Plaintiff's arm was in a cast for six weeks and she was off work for nine weeks where she had earned $245 a month. She also has had certain female disorders since her fall. All things considered, we do not feel inclined to further reduce the judgment.
The judgment is reversed and the cause remanded with directions to the trial court to reinstate the reduced judgment of $12,-500, with 6% interest thereon from July 2, 1951.
All concur.